Filing # 83733624 E-Filed 01/22/2019 06:46:18 PM

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.:_____

BERNARD PERLMUTTER, ESQ.,          :
as Personal Representative of the          :
ESTATE of N.V.                                         :
                                                                    :
                    Plaintiff,                                 :
vs.                                                               :
                                                                    :
FLORIDA DEPARTMENT OF               :
CHILDREN AND FAMILIES,                  :
OUR KIDS OF MIAMI-DADE/MONROE, :
INC., CHARLEE OF DADE COUNTY,    :
INC.,  THE CHILDREN'S HOME           :
SOCIETY OF FLORIDA, THE CENTER  :
FOR FAMILY AND CHILD                    :
ENRICHMENT, INC., MIAMI BRIDGE   :
YOUTH AND FAMILY SERVICES, INC., :
HIS HOUSE, INC. d/b/a HIS HOUSE     :
CHILDREN'S HOME, VANITA              :
MOSQUERA; and MAJORIE JANVIER   :
                                                                    :
                    Defendants.                            :
_____/

## COMPLAINT

The Plaintiff, BERNARD PERLMUTTER, ESQ., as Personal Representative of the

ESTATE OF N.V., by and through undersigned counsel, hereby sues the Defendants, FLORIDA

DEPARTMENT OF CHILDREN AND FAMILIES, OUR KIDS OF MIAMI-DADE/MONROE,

INC., CHARLEE OF DADE COUNTY, INC., THE CHILDREN'S HOME SOCIETY OF

FLORIDA, THE CENTER FOR FAMILY AND CHILD ENRICHMENT, INC., MIAMI

BRIDGE YOUTH AND FAMILY SERVICES, INC., HIS HOUSE, INC. d/b/a HIS HOUSE

CHILDREN'S HOME, VANITA MOSQUERA, and MAJORIE JANVIER, and alleges:

## JURISDICTION

1.       This is a cause of action for damages that exceeds $15,000.00, exclusive of attorney's fees, interests, and costs.

2.       This action is brought pursuant to § 46.01, Florida Statutes, for survival claims; §§ 768.16 – 768.26 of the Florida Statutes, the "Florida Wrongful Death Act;" and 42 U.S.C. § 1983 for survival claims and wrongful death claims.

3.       The cause of action accrued in Miami-Dade County, Florida.

## THE PARTIES

4.       At all times material hereto, the deceased minor child, N.V., whose date of birth was December 15, 2002, and whose date of death was January 22, 2017, was a minor child residing in Miami-Dade County, Florida.

5.       Plaintiff, BERNARD PERLMUTTER, ESQ., is the duly appointed Personal Representative of the Estate of N.V., having been appointed by Order Appointing Personal Representative by the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County Florida, on or about October 4, 2018, and is authorized to bring a survival action pursuant to § 46.021, Florida Statutes, and 42 U.S.C. § 1983, and a wrongful death action under § 768.16, et seq., Florida Statutes, and 42 U.S.C. § 1983 against the Defendants. Plaintiff has made pre-suit records requests to THE FLORIDA DEPARTMENT OF CHILDREN AND FAMILIES, OUR KIDS OF MIAMI-DADE/MONROE, INC., CHARLEE OF DADE COUNTY, INC., THE CHILDREN'S HOME SOCIETY OF FLORIDA, THE CENTER FOR FAMILY AND CHILD ENRICHMENT, INC., MIAMI BRIDGE YOUTH AND FAMILY SERVICES, INC., and HIS HOUSE, INC. D/B/A HIS HOUSE CHILDREN'S HOME; however, upon information and belief, these Defendants have either failed to or refused to produce complete sets of the records requested. Therefore, Plaintiff is unable to investigate and evaluate the full scope of the Defendants' actions

2

and whether there are any additional claims. The proceeds of any recovery will be distributed in an accordance with the Order of the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, Probate Division.

6.      Defendant, THE FLORIDA DEPARTMENT OF CHILDREN AND FAMILIES (hereinafter "DCF"), is the state agency charged with the non-delegable duty of ensuring the health, welfare, and safety of children in state custody; operating and overseeing the state foster care system; performing all child protective investigations in Miami-Dade County; providing substitute care services to children placed in its care; licensing and monitoring foster homes, foster care facilities, emergency shelters, and group homes; and licensing and monitoring contracted and subcontracted agencies pursuant to Chapter 409 of the Florida Statutes.

7.      Defendant, OUR KIDS OF MIAMI-DADE/MONROE, INC. (hereinafter "OUR KIDS"), is a private non-governmental Florida Corporation operating its business in Miami-Dade County, Florida, and at all times material hereto, was the lead agency for community-based care in Miami-Dade County, Florida pursuant to §§ 409.1671 and/or 409.986, et seq., Florida Statutes, and contracted with DCF as an independent contractor to provide foster care and related services to children in the custody of the State of Florida, including N.V.

8.      At all times material hereto, OUR KIDS was required to monitor the performance of its sub-contracted providers to ensure compliance with applicable Florida Statutes, Florida Administrative Code rules, DCF Operating Procedures, OUR KIDS Policies and Procedures, and the common law, to ensure the health, welfare, and safety of children in the custody of the State of Florida, including N.V.

9.      Defendant, CHARLEE OF DADE COUNTY, INC., (hereinafter "CHARLEE") is a dissolved private non-governmental Florida Corporation which operated its business in Miami-Dade County, Florida, and at times material hereto, contracted with OUR KIDS pursuant to §

3

409.1671, Florida Statutes, as an independent contractor to provide foster care and related services, including, but not limited to, case management services, targeted case management services, behavioral services and mental health services to children in the custody of the State of Florida, including N.V.

10.     Defendant, THE CHILDREN'S HOME SOCIETY OF FLORIDA, (hereinafter "CHS") is a private non-governmental Florida Corporation which operated its business in Miami-Dade County, Florida, and at times material hereto, contracted with OUR KIDS pursuant to § 409.1671, Florida Statutes, as an independent contractor to provide foster care and related services, including, but not limited to, recruitment, training, licensing, re-licensing, and support of foster homes, for the child welfare system within Miami-Dade County, including the medical foster home of VANITA MOSQUERA ("MOSQUERA").

11.     Defendant, THE CENTER FOR FAMILY AND CHILD ENRICHMENT, INC., (hereinafter "CFCE") is a private non-governmental Florida Corporation which operated its business in Miami-Dade County, Florida, and at times material hereto, contracted with OUR KIDS pursuant to § 409.1671 and/or 409.986, et. seq., Florida Statutes, as an independent contractor to provide foster care and related services, including, but not limited to, case management services, targeted case management services, behavioral services and mental health services to children in the custody of the State of Florida, including N.V.

12.     Defendant, MIAMI BRIDGE YOUTH AND FAMILY SERVICES, INC., (hereinafter "MIAMI BRIDGE") is a private non-governmental Florida Corporation operating its business in Miami-Dade County, Florida, and at times material hereto, provided emergency shelter services in Miami-Dade County to minor children in the legal and physical custody of the State of Florida, including N.V., pursuant to §§ 409.986, et. seq., Florida Statutes, as an independent contractor.

4

13. Defendant, HIS HOUSE, INC. d/b/a HIS HOUSE CHILDREN'S HOME (hereinafter "HIS HOUSE") is a private non-governmental Florida Corporation operating its business in Miami-Dade County, Florida, and at times material hereto, provided residential group care services in Miami-Dade County to minor children in the legal and physical custody of the State of Florida, including N.V., pursuant to §§ 409.986, et. seq., Florida Statutes, and a contract with OUR KIDS as an independent contractor.

14. At times material hereto, Defendant MOSQUERA was a licensed foster parent providing medical foster care services to foster children in Miami-Dade County, including N.V.

15. At times material hereto, Defendant MAJORIE JANVIER (hereinafter "JANVIER"), was a licensed foster parent providing foster care services to foster children in Miami-Dade County, including N.V.

16. At all times material hereto, OUR KIDS, CHARLEE, CHS, CFCE, MIAMI BRIDGE, and HIS HOUSE, through their agents and employees, were independent contractors and were not acting as officers, employees, or agents of the State of Florida for purposes of § 768.28, Florida Statutes.

## **GENERAL ALLEGATIONS UNRELATED TO DEATH**

17. On or about January 13, 2009, DCF placed N.V. in the custody of the State of Florida due to physical abuse.

18. On or about January 13, 2009, DCF assigned N.V.'s case to OUR KIDS to provide foster care and related services.

19. On or about January 13, 2009, OUR KIDS' Intake Department accepted N.V.'s case for services and was responsible for the placement and appropriate care of N.V., escalating N.V.'s case internally if there was concern for her safety and well-being, completing an initial Intake Assessment, completing a final Intake Assessment, reviewing all documents and

5

information available for N.V., and making recommendations with respect to appropriate services and placement needs.

20. On or about January 13, 2009, OUR KIDS assigned N.V.'s case to CHARLEE to provide case management services.

21. On or about January 13, 2009, DCF, OUR KIDS, and CHARLEE knew that N.V. had sickle cell anemia, a serious medical condition which caused chronic pain and required her to receive specialized care and treatment, and that N.V. had previously engaged in child-on-child sexual behavior.

22. On or about February 9, 2009, OUR KIDS and CHARLEE received a copy of N.V.'s Level of Care Assessment which also diagnosed her with Adjustment Disorder with Disturbance of Conduct and rule out Attention Deficit Hyperactivity Disorder.

23. Within two months of being in foster care, N.V. was placed in three different foster homes due to a shortage of placements in Miami-Dade County within OUR KIDS' system of care.

24. On or by March 5, 2009, DCF, OUR KIDS, CHARLEE, CHS and MOSQUERA knew that N.V. was sexually reactive and required a psychosexual assessment, sexual abuse therapy, and a sexual safety plan to protect her pursuant to DCF Operating Procedure 175-88 and F.A.C. 65C-28.004 to protect her from further sexual abuse and child-on-child sexual abuse.

25. However, on or about March 5, 2009, OUR KIDS, CHARLEE, and CHS approved placement of N.V. in MOSQUERA'S medical foster home, due to N.V.'s sickle cell anemia diagnosis, and MOSQUERA accepted N.V. for placement with no safety plan in place in violation of DCF Operating Procedure 175-88 and F.A.C. 65C-28.004 since MOSQUERA'S three grandchildren/adopted children and a thirteen-year-old male foster child, T.P., also resided in the home at the time of N.V.'s placement.

26. On or about May 4, 2009, two months after N.V. was placed in the MOSQUERA home, a safety plan was finally implemented requiring N.V., to *inter alia*, have her own room, never be placed in a bedroom with a younger child, not be left alone around boys or girls, to try to not leave N.V. alone at any point, monitor N.V. around her dolls, and to try to keep sharp objects away from N.V.

27. However, OUR KIDS, CHARLEE, CHS, and MOSQUERA failed to comply with the safety plan and failed to inform N.V.'s school and camp of the need to monitor her due to the risk to her serious mental health needs, resulting in N.V.'s continued sexualized behaviors and sexual abuse by other children in the MOSQUERA foster home, at school, and at camp.

28. On or about May 20, 2009, DCF received a report through the Abuse Hotline alleging that a N.V. was touched sexually by a classmate in school.

29. During the investigation, DCF learned that N.V. had also engaged in child-on-child sexual activity with a female classmate in school.

30. N.V.'s continued sexual behaviors and victimizations were made known to DCF, OUR KIDS, CHARLEE, CHS, and MOSQUERA.

31. Despite N.V.'s clear need for specialized placement and precautions to address her sexual behaviors and vulnerability for further sexual abuse and harm to her emotional well-being, CHARLEE informed DCF that there were no safety concerns.

32. DCF, OUR KIDS, CHARLEE, CHS, and MOSQUERA allowed N.V. to remain in the MOSQUERA foster home where she was at substantial risk of serious harm because there were no other medical foster homes available within OUR KIDS' system of care.

33. On or about September 1, 2009, another safety plan was implemented requiring N.V., to *inter alia*, never be placed in a bedroom with a younger child or more vulnerable child; never be placed in a bedroom with another child with a sexual alert or with a history of sexual

7

abuse victimization, sexual aggression, or sexual reactivity; always be monitored; and take a shower under the supervision of MOSQUERA.

34. However, OUR KIDS, CHARLEE, CHS, and MOSQUERA failed to comply with the safety plan resulting in N.V.'s continued sexually reactive behaviors in the foster home, at school, and at camp, and sexual assaults/sexual batteries by other children in the MOSQUERA foster home.

35. In 2009, N.V. engaged in child-on-child sexual behaviors with MOSQUERA'S grandson/adoptive son while they were unsupervised in the MOSQUERA home.

36. Between April 2009 and December 2009, six-year-old N.V. was sexually assaulted/sexually battered on multiple occasions by T.P., the thirteen/fourteen-year-old male foster child in the MOSQUERA home, who was more than double her age, while they were unsupervised in T.P.'s bedroom.

37. The sexual assaults/sexual batteries of N.V. by T.P. were reported to the DCF Abuse Hotline, DCF closed its investigation with indicators of inadequate supervision by MOSQUERA, and T.P. was found to be at moderate risk of recidivism and in need of a sexual abuse program.

38. OUR KIDS, CHARLEE, and CHS were informed of the sexual assaults/sexual batteries of N.V. by T.P. in the MOSQUERA home, of DCF's findings, and that MOSQUERA also had unauthorized people living in the home.

39. Moreover, despite N.V.'s clear need for specialized therapy to address her sexually reactive behaviors, sexual abuse victimization, and vulnerable emotional condition, between July 2009 and August 2009, MOSQUERA failed to take N.V. to her specialized sexual abuse therapy at least six (6) times resulting in N.V.'s termination from sexual abuse therapy due to MOSQUERA'S non-compliance.

8

40.     DCF, OUR KIDS, CHARLEE, CHS, and MOSQUERA knew that N.V.'s sexual behaviors escalated significantly while in foster care; N.V.'s other behaviors escalated while in foster care including stealing and aggressiveness with other children; N.V.'s mental health deteriorated significantly while in foster care resulting in N.V. being recommended to be placed on psychotropic medication at only six-years-old; and MOSQUERA was unable to meet N.V.'s immediate need for safety and protection; yet DCF, OUR KIDS, CHARLEE, CHS, and MOSQUERA allowed N.V. to remain in this dangerous placement where her mental health condition significantly deteriorated and she was at substantial risk of serious harm, including further physical, sexual and emotional abuse.

41.     On or about January 28, 2010, DCF received a report through the Abuse Hotline alleging that MOSQUERA had improperly physically abused N.V. resulting in physical injury that was still visible a week later.

42.     DCF closed its investigation with verified findings of physical abuse by MOSQUERA after a medical examination by the Child Protection Team ("CPT) confirmed this and it was determined by CPT that MOSQUERA'S use of physical discipline was "completely inappropriate," especially in light of the reason N.V. came into foster care.

43.     OUR KIDS, CHS, and CHARLEE were informed of the abuse report and the findings and MOSQUERA was placed on a corrective action plan by DCF, OUR KIDS and CHS; however, DCF, OUR KIDS, CHARLEE, CHS, and MOSQUERA allowed N.V. to remain in this dangerous placement where she was at substantial risk of serious harm.

44.     N.V. continued to engage in sexually reactive behaviors including exposing herself in school, urinating in the sink at school, urinating in trash cans at the MOSQUERA foster home; continued to deteriorate behaviorally including stealing cell phones and other belongings from others; and continued to deteriorate emotionally while in foster care.

9

45.     In May 2010, due to N.V.'s increasing sexualized and defiant behaviors, CHARLEE began providing targeted case management services to N.V., which is a specialized form of case management due to her deteriorating emotional condition.

46.     On or about June 2, 2010, N.V. finally received her first psychosexual evaluation at OUR KIDS and CHARLEE'S request to assess N.V.'s current level of functioning, evaluate risk for engaging in sexually inappropriate behaviors, and identify treatment needs applicable to psychological and/or psychosexual issues.

47.     OUR KIDS and CHARLEE became aware that N.V. expressed thoughts of self-harm and suicidal ideations during the psychosexual evaluation, engaged in inappropriate sexualized behaviors during the evaluation, the assessor determined that N.V. was at risk to demonstrate sexually reactive behaviors in the future, the assessor recommended that N.V. receive treatment with an emphasis on sexual issues, and it was OUR KIDS' and CHARLEE'S responsibility to ensure the recommendations were complied with.

48.     On or about June 22, 2010, N.V. was reunified with her biological mother; however, N.V. had become so sexually reactive and her behavior had escalated so much while in foster care that her behaviors continued to exist upon reunification which caused much greater parenting challenges.

49.     OUR KIDS and CHARLEE continued to provide Court Ordered protective supervision to N.V. until December 22, 2010.

50.     CHARLEE also continued to provide targeted case management services, behavioral services, and/or mental health services to N.V. until November 2011, due to N.V.'s continued sexually reactive behaviors.

51.     On or about April 20, 2014, after N.V. ran away from her biological mother, made allegations of abuse which were unfounded by CPT, and her mother advised that she could not control N.V.'s sexualized behaviors, N.V. was placed back in foster care by DCF.

52.     On or about April 20, 2014, DCF again assigned N.V.'s case to OUR KIDS to provide foster care and related services.

53.     On or about April 20, 2014, OUR KIDS' Intake Department accepted N.V.'s case for services and was responsible for assisting in the decision about the best course of action for N.V., escalating N.V.'s case internally if there was concern for her safety and well-being, completing an initial Intake Assessment, completing a final Intake Assessment, reviewing all documents and information available for N.V., and making recommendations with respect to appropriate services and placement needs.

54.     On or April 21, 2014, OUR KIDS assigned N.V.'s case to CFCE to provide case management services.

55.     On or before April 21, 2014, DCF, OUR KIDS, and CFCE knew that:

   a.  N.V.'s mental health condition had dramatically deteriorated during her 2009 placement in foster care and thereafter;

   b.  N.V. had sickle cell anemia, a serious medical condition which caused chronic pain and required her to receive specialized care and treatment in a medical foster home with a medically trained foster parent;

   c.  N.V. had a significant history of sexually reactive behaviors which required a safety plan and for N.V. to be closely monitored;

   d.  N.V. had been sexually assaulted/sexually battered by an older foster child, when she was in foster care in 2009;

   e.  N.V. sexually acted out on her two-year-old brother;

11

    f.  N.V. had been engaging in sexually inappropriate behaviors on social media and via text messages including sexting and sending/posting sexual photos and videos;

    g.  N.V.'s mother was unable to provide constant supervision to N.V. due to having to work to support the household;

    h.  N.V. had been Baker Acted in 2010 after telling her teacher that she was very depressed, was unhappy with herself, and threatened to kill herself with a knife;

    i.  N.V. had made suicidal ideations in 2011 and 2013;

    j.  N.V. had been diagnosed with Adjustment Disorder with Disturbance of Conduct, Attention Deficit Hyperactivity Disorder, and Depression;

    k.  N.V. was on psychotropic medication due to her mental health diagnoses; and

    l.  N.V. required specialized placement and services due to her history of sexual behaviors, aggressive behaviors, and mental health issues.

56.    In March 2011, three years before N.V. was placed in foster care for the second time, OUR KIDS and CFCE were the subject of public review and criticism regarding child welfare concerns and corrective action required from an independent review team which investigated the death of Nubia Barahona and the egregious abuse of her brother. OUR KIDS and CFCE were the same agencies involved in the Barahona case. DCF, OUR KIDS and CFCE had been on notice since at least 2011 of deficiencies in the quality of CFCE's case management and in OUR KIDS' oversight of CFCE, and OUR KIDS and CFCE were required to address these deficiencies via corrective action, but they failed to do so and the same deficiencies still existed in N.V.'s case.

57.    Further, on February 7, 2014, more than two months prior to N.V. being placed in foster care for the second time, OUR KIDS received written notice from DCF of systemic

deficiencies within OUR KIDS' system of care including, but not limited to, shortage of appropriate foster homes, overutilization of group care, lack of timeliness in locating placements, and lack of targeted recruitment for new foster homes, and OUR KIDS was required to submit a corrective action plan to DCF to address these systemic deficiencies.

58.    However, OUR KIDS failed to remedy these systemic deficiencies and due to a continued shortage of placements within OUR KIDS' system of care, instead of making critical necessary arrangements for an appropriate placement to address N.V.'s sexualization, mental health conditions, and medical needs, N.V. was inappropriately placed in a traditional foster home that could not meet her serious emotional and medical needs, and as a result of this inappropriate placement N.V.'s mental health continued to deteriorate.

59.    On or about April 30, 2014, less than two weeks after being placed back in foster care, N.V. was Baker Acted when her foster parent found a writing authored by N.V.s asking someone to kill her.

60.    On or about May 14, 2014, N.V. was again determined eligible for medical foster care due to her sickle cell anemia diagnosis; however, due to a continued shortage of placements within OUR KIDS' system of care, no medical foster homes or any other suitable placements were available for N.V., and instead of finding a safe placement that could meet her medical and mental health needs, OUR KIDS and CFCE approved N.V. spending her days in the CFCE office and sleeping in hotels with CFCE staff for at least two weeks.

61.    On or about May 14, 2014, OUR KIDS acknowledged pre-existing systemic failures in its child protection system of care by admitting that there was a "placement monster" in Miami-Dade County for children assigned to licensed foster care and that there continued to be a shortage of safe placements for children within its system of care. It was OUR KIDS' responsibility to remedy these deficiencies, recruit more foster parents, and ensure that there were

sufficient placements and services for all children in foster care, including N.V., but it failed to do so.

62.    In 2014, DCF facilitated a peer consultation to examine the Southern Region, the DCF catchment area where OUR KIDS was located, and advised OUR KIDS of the following systemic concerns regarding its child protection system of care:

    a. There was an absence of genuine partnership and trust among OUR KIDS and its subcontracted agencies;

    b. There was an absence of on-going leadership collaboration across OUR KIDS' system of care with a perception that the system lacked transparency while operating in a high pressure and critical environment;

    c. A high turnover in staff had resulted in an inexperienced workforce that affected the quality across the entire system of care;

    d. The licensing, recruitment and retention of foster homes had not been sufficient to meet projected goals and unable to support even a modest increase in need; and

    e. OUR KIDS needed to increase its oversight, support and accountability of case management services by implementing a robust information reporting system and reviewing performance levels closely and frequently.

63.    OUR KIDS was required by DCF to remedy these deficiencies to ensure the safety of all children within its system of care, including N.V., but it failed to do so.

64.    On or about May 29, 2014, OUR KIDS and CFCE received a copy of N.V.'s Level of Care Assessment which diagnosed N.V. with, *inter alia*, Attention Deficit Hyperactivity Disorder by history, Child or Adolescent Antisocial Behavior by history, and Sexual Abuse of Child by history, and documented that N.V.'s caregiver at the time of the assessment felt that N.V.

14

needed to be in therapeutic foster care, a specialized placement with trained foster parents, to meet her most serious mental health needs.

65.    On or about June 9, 2014, OUR KIDS facilitated a Multi-Disciplinary staffing with CFCE and it was recommended that N.V. either be placed in a Specialized Therapeutic Foster Home or if she was placed in a traditional foster home that she receive a one to one shadow until services were in place or N.V. was placed in a Specialized Therapeutic Foster Home; however, due to the continued placement crisis in Miami-Dade County which was not remedied by OUR KIDS, no such placements or services existed and N.V.'s mental health continued to deteriorate while in foster care.

66.    On or before June 11, 2014, CFCE began providing mental health services to N.V., CFCE knew that N.V. had verbalized suicidal ideations in the past, and CFCE diagnosed N.V. with Attention Deficit Hyperactivity Disorder, Oppositional Defiant Disorder, and Generalized Anxiety Disorder clearly demonstrating worsening mental health symptoms and diagnoses.

67.    After having completely failed to meet her therapeutic needs causing N.V. further deterioration in care, on or about June 26, 2014, OUR KIDS and CFCE reunified N.V. with her mother again even though they knew N.V.'s mother had to work to maintain the household and was unable to provide N.V. the level of supervision she needed due to her significantly deteriorated mental health and behavioral issues.

68.    OUR KIDS and CFCE continued to provide ongoing Court Ordered protective supervision to N.V.

69.    CFCE also continued to provide ongoing behavioral and/or mental health services to N.V.

70.    On or about April 18, 2016, N.V. was placed back in the care and custody of the State of Florida for the third time pursuant to a modification of placement because N.V.'s mother

was unable to control N.V.'s behaviors and OUR KIDS and CFCE had failed to provide additional services the mother requested and the Court ordered in January 2016.

71.     OUR KIDS continued to provide foster care and related services to N.V., remained responsible for ensuring N.V. was in a safe placement that could meet her serious mental health and medical needs, and remained responsible for ensuring N.V. received specialized therapeutic and behavioral services to address her serious mental health and medical needs.

72.     CFCE continued to provide case management services, therapeutic services, and targeted case management services to N.V.

73.     On or before April 18, 2016, DCF, OUR KIDS, and CFCE knew that:

    a.  N.V. continued to engage in sexually reactive behaviors in various settings;

    b.  N.V. continued to engage in inappropriate sexual behaviors including: accessing pornography on her smart phone and computer; sending letters to boys offering to engage in sex acts for money; posting sexually explicit posts and videos on social media; sexting and sending sexually explicit photos of herself via text message and social media messenger, and needed to be supervised and monitored;

    c.  N.V. had a psychological evaluation on or about June 19, 2015 which:

        i.  Clearly indicated N.V.'s "significant depression" and potential for self-harm;

        ii.  In the psychological testing N.V. revealed that the thing she wanted to do most of all "is die happy;"

        iii.  The psychologist reported that N.V. "appears to be a depressed, angry and fearful young girl who has marked worries about her health and well-being;"

    iv. N.V. had "significant fears about her Sickle Cell condition;"

    v. "N.V. thinks about death and dying often;"

    vi. The psychologist rendered the opinion that although N.V. had been diagnosed with Attention Deficit Hyperactivity Disorder, "there is much concern that her attention problems are due to anxiety and trauma rather than true ADHD symptomology."

    vii. The psychologist felt that N.V. should not be left home alone by herself due to her ability to dissociate easily;

    viii. N.V. was diagnosed with Post-Traumatic Stress Disorder, Dysthymic Disorder, and Generalized Anxiety Disorder; and

    ix. It was recommended that N.V. have individual therapy with a qualified professional, a safety plan, a psychiatric evaluation to clarify her diagnosis, and that her medication be re-evaluated due to her "pronounced depression" as Adderall can cause the side effects of depression.

d. On or about June 25, 2015, the Court Ordered DCF, OUR KIDS, and CFCE to ensure N.V. was receiving individual therapy with a master's level therapist who was to receive a copy of the June 2015 psychological evaluation, that N.V. be re-evaluated by a psychiatrist for diagnosis and medication management, and that the psychiatrist be given a copy of the June 2015 psychological evaluation;

e. N.V. was on psychotropic medication including Adderall for ADHD and Zoloft for depression;

f. N.V. had a history of running away;

g. N.V. had exhibited defiant behaviors and refused to follow rules;

17

      h.  N.V. required specialized therapeutic and behavioral services due to her history of sexual behaviors, aggressive behaviors, running away, and mental health issues;

      i.  N.V. required placement in medical foster care due to her sickle cell anemia diagnosis;

      j.  N.V. required specialized placement in therapeutic foster care due to a prior recommendation for this level of care in 2014 and N.V.'s behaviors and mental health had escalated since that time; and

      k.  N.V.'s mental health condition and at-risk behaviors posed a danger to herself and others.

74.    DCF, OUR KIDS, and CFCE had respective duties to immediately comply with all Court Orders and act with urgency to ensure N.V. received the placement and services she required to keep her safe and prevent her further deterioration; however, they failed to do so and N.V.'s behavior and mental health rapidly deteriorated while in foster care.

75.    DCF and OUR KIDS knew that on January 12, 2016, three months before N.V. was placed in foster care for the third time, Eleventh Judicial Circuit of Florida Dependency Judge Michael A. Hanzman entered an order raising systemic failures of DCF and OUR KIDS which made findings as to the DCF/OUR KIDS child protection system in Miami-Dade County. The judge condemned OUR KIDS' system of care calling it "irreparably broken," finding it to be an "over-delegated" "inefficient bureaucracy" with "lack of accountability" that cannot deliver high quality level of care to dependent children in Miami-Dade County. The judge further condemned DCF, OUR KIDS, and their subcontracted providers, including CFCE, for failing to provide services to dependent children, failing to comply with Court Orders, sometimes ignoring Court Orders all together, and otherwise failing to protect children in foster care, resulting in harm and

even abuse to children while in care. DCF and OUR KIDS were ordered to meet and present an acceptable protocol designed to ensure that all court orders requiring services to a dependent child are received by an individual designated by each entity and that compliance is monitored. Although these further deficiencies were known to DCF, OUR KIDS, and CFCE as of January 2016, no action was taken to improve the system of care, and court orders continued to be violated in N.V.'s case during N.V.'s third stay in foster care between April 2016 and January 2017.

76.     Further, due to a continued shortage of placements in Miami-Dade County which OUR KIDS was on notice of and required to remedy more than two years earlier by recruiting additional foster homes but failed to do, on or about April 18, 2016, DCF, OUR KIDS, and CFCE authorized N.V.'s first placement during this stay in foster care, either in a traditional foster home that was a dangerous placement for her and could not meet her serious medical and emotional needs, or allowed N.V. to spend the night with CFCE employees in a hotel or the CFCE office.

77.     On or about April 19, 2016, due to OUR KIDS' failure to remedy the continued placement crisis in Miami-Dade County, OUR KIDS and CFCE authorized N.V.'s second placement at MIAMI BRIDGE emergency shelter with no safety plan in place despite knowledge that MIAMI BRIDGE was a dangerous placement for N.V., could not meet N.V.'s serious medical and mental health needs, could not meet N.V.'s immediate need for protection and safety, and that N.V. needed a higher level of care and supervision than MIAMI BRIDGE could provide.

78.     On or before April 19, 2016, MIAMI BRIDGE knew or should have known that:

    a.   This was N.V.'s third time in foster care;

    b.   N.V. had been sexually assaulted/sexually battered while in foster care in 2009; had a history of sexually reactive and aggressive behaviors; and required a safety plan with her having her own room and being constantly supervised

around other children to prevent further incidents of sexual abuse and sexually reactive and aggressive behaviors;

c. N.V. had a history of engaging in inappropriate sexual behaviors including: accessing pornography on her smart phone and computer; sending letters to boys offering to engage in sex acts for money; posting sexually explicit posts and videos on social media; sexting and sending sexually explicit photos of herself via text message and social media messenger, and needed to be supervised and monitored on the phone, internet, and social media;

d. N.V. had a significant mental health history with varying diagnoses over the years including: Adjustment Disorder with Disturbance of Conduct, Attention Deficit Hyperactivity Disorder; Oppositional Defiant Disorder; Generalized Anxiety Disorder; Post-Traumatic Stress Disorder; Dysthymic Disorder; Major Depressive Disorder; and Bipolar Disorder;

e. N.V. had been Baker Acted for suicidal ideations in the past several times;

f. N.V. was on psychotropic medication;

g. N.V. had a history of running away;

h. N.V. had exhibited defiant behaviors and refused to follow rules;

i. N.V. required specialized therapeutic and behavioral services due to her history of sexual behaviors, aggressive behaviors, running away, and mental health issues;

j. N.V. required placement in medical foster care due to her sickle cell anemia diagnosis; and

    k.  N.V. required specialized placement in therapeutic foster care due to a prior recommendation for this level of care in 2014 and N.V.'s behaviors and mental health had escalated since that time.

79.    Because of N.V.'s significant medical, mental health and behavioral history, she should have been immediately denied admission to MIAMI BRIDGE; however, MIAMI BRIDGE accepted N.V. for placement at its emergency shelter with no safety plan despite OUR KIDS, CFCE, and MIAMI BRIDGE'S knowledge that MIAMI BRIDGE was a dangerous placement, could not meet N.V.'s serious medical and mental health needs, could not meet N.V.'s immediate need for protection and safety, and that N.V. needed a higher level of care than MIAMI BRIDGE could provide. N.V. remained in this placement for approximately six weeks.

80.    At all times material hereto, OUR KIDS was the central Point of Contact for referring children for Level of Care Assessments and accessing other behavioral health assessments and mental health services as needed.

81.    At all times material hereto, OUR KIDS was required to:

    a.  Provide consultation in accessing screening for mental health issues, professional assessments, and timely treatment at levels appropriate to the condition and severity of the child for children in out-of-home care;

    b.  Manage the referral, quality, and tracking of Level of Care Assessments;

    c.  Serve as a consultant in making timely, appropriate, and effective referrals to mental health and behavioral services;

    d.  Provide assistance in obtaining clinical case consultation for especially complex cases;

    e.  Manage the multi-disciplinary staffing process for placement in Specialized Therapeutic Foster Care; and

      f.  Manage the process of referring children for initial Suitability Assessments for residential treatment facilities.

82.    The purpose of the Level of Care Assessment was to, *inter alia*, provide recommendations for treatment and placement based upon professional judgment and was required to be completed within thirty (30) days of N.V. entering foster care again; however, OUR KIDS failed to ensure that this critical assessment was completed for N.V. between April 2016 and January 2017.

83.    On or about April 20, 2016, the dependency court entered an Order on Restrictions on Child's Cell Phone and Internet Usage ordering that "effective immediately, [N.V.'s] cell phone and internet usage shall be supervised by an agent from the department."

84.    OUR KIDS, CFCE, MIAMI BRIDGE, and every subsequent placement N.V. resided in were required to comply with this Court Order; however, they failed to do so.

85.    On or about April 20, 2016, the dependency court entered an Order requiring N.V. to undergo a psychological evaluation for purposes of diagnosis of any possible mental conditions and inappropriate texting issues.

86.    DCF, OUR KIDS, and CFCE were required to comply with this and every other Court Order; however, DCF, OUR KIDS, and CFCE instead requested that the Court vacate this order because N.V. had a psychological evaluation in 2015, the same evaluation referenced above which expressed such significant concerns for N.V.'s depression and suicidal risk. The Court vacated its prior order upon the request of DCF, OUR KIDS, and CFCE on May 3, 2016.

87.    Because DCF, OUR KIDS, and CFCE objected to a new psychological evaluation for N.V., their duty required them to ensure that each and every precaution and recommendation of the June 2015 psychological evaluation was implemented to ensure N.V.'s safety and prevent further deterioration.

88.     On or about April 26, 2016, OUR KIDS and CFCE knew that N.V. was placed on Vyvanse for ADHD and one of the side effects for the caregiver to monitor was suicidal ideations. OUR KIDS and CFCE had an obligation to consider this risk with respect to every potential placement and to inform all caregivers of the need to monitor N.V. for suicidal ideations and/or attempts, but failed to do so.

89.     On or about May 10, 2016, CFCE began providing targeted case management services to N.V.

90.     OUR KIDS was required to conduct a Level of Care staffing for N.V. within thirty (30) days of her placement in foster care to determine her final level of care, but it failed to do so.

91.     OUR KIDS, CFCE, and MIAMI BRIDGE knew that during N.V.'s first few weeks at MIAMI BRIDGE, she was "written up" three times, once for defecating in the girls shower and twice for sexual misconduct with a male resident at MIAMI BRIDGE; however, OUR KIDS, CFCE, and MIAMI BRIDGE allowed N.V. to remain at this emergency shelter that was dangerous for her and could not meet her serious medical and mental health needs or immediate need for protection and safety.

92.     On or about June 2, 2016, N.V. was discharged from MIAMI BRIDGE for the first time.

93.     On or about June 2, 2016, due to OUR KIDS' failure to remedy the placement crisis in Miami-Dade County resulting in continued placement limitations, OUR KIDS and CFCE authorized placement of N.V. in a CFCE group home for one night with one to one services; however, due to capacity issues, N.V. was not formally placed at the group home. This was N.V.'s third placement in six weeks.

94.     On or about June 3, 2016, despite N.V.'s need for medical and/or therapeutic placement, her deteriorating mental health, and her increasingly dangerous behaviors since

entering foster care, OUR KIDS and CFCE authorized placement of N.V. in a traditional foster home that was a dangerous placement for her, could not meet N.V.'s serious medical and mental health needs, and could not meet N.V.'s immediate need for protection and safety. This was N.V.'s fourth placement in six weeks and she only remained in this placement for ten (10) days.

95.     On or about June 3, 2016, a safety plan was implemented for N.V. giving her an Alert A which identified her as a sexual abuse victim, Alert C which identified her as sexually reactive, and Alert D which identified her as sexually aggressive, and requiring N.V.'s social media access to be monitored.

96.     Between June 3, 2016 and June 13, 2016, OUR KIDS and CFCE knew that N.V.'s behaviors escalated including engaging in physical aggression with younger children in her foster home, refusing to follow house rules, and engaging in inappropriate behaviors with the other children in the home and the foster father.

97.     On or about June 13, 2016, despite N.V.'s need for medical and/or therapeutic placement, her continued deteriorating mental health, and her increasingly dangerous behaviors since entering foster care, OUR KIDS and CFCE authorized placement of N.V. in another traditional foster home that was a dangerous placement for N.V., that could not meet her serious medical and mental health needs or N.V.'s immediate need for protection and safety. This was N.V.'s fifth placement in less than two months and she only remained in this placement for eleven (11) days.

98.     On or before June 24, 2016, OUR KIDS and CFCE knew that N.V. was stealing from other foster children, was not supposed to have a phone but had one and was using it unsupervised constantly, was using a tablet in the foster home and making inappropriate videos on Facetime, was verbally and physically aggressive, was engaging in hyper-sexualized behaviors,

and her foster parent asked for N.V. to be removed from the foster home because of N.V.'s escalating behaviors.

99.     On or about June 24, 2016, despite N.V.'s need for medical and/or therapeutic placement, her continued deteriorating mental health, and her increasingly dangerous behaviors since entering foster care, OUR KIDS and CFCE authorized placement of N.V. in another traditional foster home that was a dangerous placement for N.V. that could not meet her serious medical and mental health needs or her immediate need for protection and safety. This was N.V.'s sixth placement in just over two months.

100.    On or about July 5, 2016, OUR KIDS facilitated a Multi-Disciplinary staffing with CFCE. Although a Multi-Disciplinary staffing when N.V. was in foster care in 2014 determined that N.V. needed placement in a specialized therapeutic foster home and N.V.'s behaviors became significantly worse since then including bullying others, stealing, cursing, and not following rules resulting in six (6) different placements since April 2016, OUR KIDS and CFCE inappropriately determined that N.V.'s presentation did not warrant placement in a specialized therapeutic foster care placement and that she could be managed in a traditional setting with appropriate therapeutic services.

101.    Upon information and belief, in July 2016, N.V. ran away from foster care. Upon recovering N.V. from runaway status, OUR KIDS and CFCE were required to staff N.V.'s case to determine the need for further appropriate services and/or change in placement and to refer N.V. for a mental health evaluation and substance abuse assessment, but they failed to do so.

102.    Between August 3, 2016 and August 10, 2016, N.V. was hospitalized for a sickle cell crisis.

103.    Despite N.V.'s clear need for specialized placement due to her chronic medical condition, ongoing mental health issues, and her escalating behaviors, OUR KIDS and CFCE

placed N.V. back in a traditional foster home that could not meet her serious medical and mental health needs and could not meet N.V.'s immediate need for protection and safety.

104. On or about August 25, 2016, OUR KIDS completed a human trafficking/commercial sexual exploitation of children tool for N.V. due to her history of sexting and sending inappropriate text messages including naked pictures of herself to a boy she met online, and OUR KIDS determined that N.V. had a possible potential of being sexually trafficked, but OUR KIDS did nothing to prevent N.V's further deterioration and risky behaviors.

105. On or before September 6, 2016, CFCE knew that N.V. had a cell phone, was using it unsupervised, and had difficulty getting up for school because she was on her cell phone during the night; however, CFCE failed to remove N.V.'s cell phone from her or inform the foster parent of the Court Order requiring N.V.'s cell phone, internet, and social media usage to be supervised at all times.

106. On or before September 21, 2016, CFCE knew that N.V. was having problems with other children at school, had posted a video on Snapchat threatening another student, posted on social media that she was thinking about bringing a knife to school, and another child N.V. had resided with at a previous foster care placement was giving her problems through Facebook. Despite the clear Order of the Court that N.V.'s cell phone, internet, and social media usage be monitored and that N.V. not access social media, CFCE failed to take any action to attempt to stop N.V. from accessing the internet, social media, or her cell phone unsupervised resulting in N.V.'s continued deterioration in foster care.

107. As of September 22, 2016, N.V., who was an extremely intelligent child and gifted student attending a magnet school, and whom had previously made A and B grades, was now receiving C's and F's, had been suspended from school on multiple occasions, and was expelled from the magnet school due to her violent, aggressive, and threatening behaviors.

108.    On or about October 7, 2016, N.V., who had no prior involvement with the criminal justice system, was arrested for criminal mischief after she got into a fight with her roommate because N.V. was using her cell phone when they were supposed to be sleeping and N.V.'s cell phone broke during the altercation causing N.V. to become aggressive, break several items in the foster home, run away, and threaten to stab her foster mother when located by law enforcement.

109.    Despite N.V.'s significant mental health deterioration and escalation in her behaviors in school and at various placements and her clear need for specialized placement, upon her release from the Department of Juvenile Justice custody on or about October 7, 2016, OUR KIDS and CFCE placed N.V. in yet another traditional foster that could not meet N.V.'s serious medical and mental health needs or N.V.'s immediate need for protection and safety. This was N.V.'s seventh placement since entering foster care in April 2016 and she only remained in this placement for four (4) days.

110.    On or about October 10, 2016, N.V.'s former foster parent informed CFCE that N.V. was disruptive in the placement, would keep the other foster children up at night because she was always on her cell phone, and she felt that N.V. had mental health issues that were not being addressed and she should be evaluated for psychiatric services. However, CFCE failed to take any action to restrict N.V.'s cell phone, internet, and social media access or inform subsequent placements of the Court Order requiring supervision of N.V.

111.    On or about October 11, 2016, due to OUR KIDS' failure to remedy the placement crisis in Miami-Dade County resulting in continued placement limitations, OUR KIDS and CFCE authorized placement of N.V. back at the MIAMI BRIDGE emergency shelter. However, when N.V. was told she was being placed back at MIAMI BRIGE, she ran away from the CFCE office at 8:00 p.m. because she did not want to go back to MIAMI BRIDGE. This was at least N.V.'s second runaway since being placed back in foster care.

112.     Upon information and belief, while on runaway N.V. used drugs, drank alcohol, and engaged in inappropriate sexual activity.

113.     On or about October 13, 2016, N.V. returned to the CFCE office on her own. Upon return from runaway, OUR KIDS and CFCE were required to staff N.V.'s case to determine the need for further services and/or change in placement and to refer N.V. for a mental health evaluation and substance abuse assessment, but they failed to do so.

114.     Instead, on or about October 13, 2016, because of OUR KIDS' failure to remedy the placement crisis in Miami-Dade County resulting in continued placement limitations caused by OUR KIDS' lack of recruitment of foster homes, OUR KIDS and CFCE authorized placement of N.V. back at MIAMI BRIDGE, the very shelter she had already been discharged from once due to her behaviors and caused her to previously run away when told she was being placed there. OUR KIDS and CFCE knew that MIAMI BRIDGE was a dangerous placement for N.V.

115.     Given N.V.'s significant mental health and behavioral history and her significant deterioration since being placed at MIAMI BRIDGE the first time, including physical aggression, expulsion from school for threatening another student with a knife on social media, runaway episodes, continued sexualized behaviors, and a delinquency charge, MIAMI BRIDGE should have immediately denied admission to N.V.; however, MIAMI BRIDGE accepted N.V. for placement at its emergency shelter despite knowledge that MIAMI BRIDGE was a dangerous placement for N.V., could not meet her serious medical and mental health needs or immediate need for protection and safety, and that N.V. needed a higher level of care than MIAMI BRIDGE could provide. This was N.V.'s eighth placement in six months and second time at MIAMI BRIDGE.

116.     Upon N.V.'s admission to MIAMI BRIDGE, OUR KIDS, CFCE, and MIAMI BRIDGE knew that MIAMI BRIDGE refused to sign the sexual safety plan for N.V. which was

required to monitor N.V. and keep her safe, thereby exposing her to the substantial risk of serious harm.

117.    At all times material hereto, OUR KIDS and CFCE knew that MIAMI BRIDGE was a dangerous placement where N.V. could not be kept safe especially in light of MIAMI BRIDGE's refusal to sign the safety plan; however, OUR KIDS, CFCE, and MIAMI BRIDGE allowed N.V. to remain at this dangerous emergency shelter.

118.    On or before October 19, 2016, CFCE and MIAMI BRIDGE knew that N.V. was further deteriorating as she admitted to abusing substances at least one time since being at MIAMI BRIDGE, wanted to see her CFCE therapist more frequently because she was not receiving the twice a week therapy that was Court Ordered, was not attending school at MIAMI BRIDGE because she was having problems with one of the male students, and was having problems with other girls in her dorm who were bothering her a lot; however, CFCE and MIAMI BRIDGE failed to get N.V. a substance abuse evaluation, failed to ensure she was placed in a therapeutic placement that could meet her needs, failed to ensure her academic needs were being met, and failed to ensure she received therapy with the Court Ordered frequency, and as a result, N.V.'s mental health continued to rapidly deteriorate and her behaviors continued to escalate.

119.    On or about October 21, 2016, after being at MIAMI BRIDGE for only a week, N.V. was discharged from MIAMI BRIDGE for smearing feces on the wall and was put on the "do not admit list."

120.    Despite N.V.'s significant mental health deterioration, escalation in her behaviors in school and in various placements, and her clear need for specialized placement, on or about October 21, 2016, OUR KIDS and CFCE placed N.V. in yet another traditional foster home that could not meet her serious and immediate medical and mental health needs or need for protection

and safety. This was N.V.'s ninth placement in six months and she only remained in this placement for three (3) days.

121. On or about October 24, 2016, OUR KIDS and CFCE placed N.V. in yet another traditional foster home that could not meet her serious medical and mental health needs or immediate need for protection and safety. This was N.V.'s tenth placement in six months and she only remained in this placement for one (1) day.

122. On or about October 25, 2016, OUR KIDS and CFCE placed N.V. in yet another traditional foster home that could not meet her serious medical and mental health needs or immediate need for protection and safety. This was N.V.'s eleventh placement in six months and she only remained in this placement for one (1) day.

123. Despite N.V.'s continued deterioration while in care and her clear need for specialized therapeutic placement, on or about October 26, 2016, OUR KIDS and CFCE continued seeking only a traditional placement for N.V. and approved placement in yet another traditional foster home which was a dangerous placement for N.V. that could not meet N.V.'s serious medical and mental health needs or immediate need for protection and safety. This was N.V.'s twelfth placement in six months, her fourth placement in five days, and she only remained in this placement for three (3) weeks.

124. On or about November 7, 2016, N.V. was Baker Acted after running into oncoming traffic when the school was trying to search her bag for marijuana.

125. On or about November 9, 2016, OUR KIDS and CFCE participated in a Multi-Disciplinary which finally, after seven months of deterioration and twelve failed placements, recommended that N.V. be placed in a specialized therapeutic foster home and a traditional foster home with wrap around services until such placement was located. OUR KIDS and CFCE acknowledged that N.V.'s behavioral issues had increased and her behaviors had worsened in

foster care including: skipping school, non-compliance with teachers in school, abusing substances, multiple disrupted placements due to behavior, verbal and physical altercations with peers, an arrest due to physical aggression, a Baker Act after running into oncoming traffic, eloping, and sexting with young boys her age; N.V.'s CFCE therapist believed N.V. was bipolar; N.V.'s therapy had been inconsistent; N.V. needed a substance abuse evaluation; N.V. needed a Suitability Assessment to determine if she required a higher level of placement; and N.V. needed a consistent placement where she could remain long term. N.V. remained on Syrtraline for depression and Vyvanse for ADHD.

126. OUR KIDS and CFCE failed to ensure N.V. received a substance abuse evaluation, consistent therapy, therapeutic placement, wrap around services while awaiting therapeutic services, and a Suitability Assessment to determine if she needed a higher level of care due to her mental health condition.

127. Further, on or about November 10, 2016, due to OUR KIDS' continued failure to remedy the placement crisis in Miami-Dade County resulting in continued placement limitations and a complete shortage of therapeutic placements to meet the needs of foster children, OUR KIDS placed N.V. on a waitlist for placement in a specialized therapeutic foster home, but failed to ensure N.V. received wrap around services while awaiting therapeutic placement.

128. On or about November 10, 2016, N.V. stole a cell phone from a CFCE employee.

129. On or about November 14, 2016, N.V. stole another cell phone from a CFCE employee while being transported to the Juvenile Assessment Center.

130. On or about November 17, 2016, N.V. ran away from her foster home and was not recovered until November 22, 2016.

131. Upon information and belief, while on runaway for five (5) days, N.V. used drugs, drank alcohol, and engaged in unprotected sex.

132.    On or about November 22, 2016, N.V. returned to the CFCE office on her own. Upon N.V. returning from runaway, OUR KIDS and CFCE were again required to staff N.V.'s case to determine the need for further services and/or change in placement, refer N.V. for a mental health evaluation and substance abuse assessment, and to ensure an appropriate placement to address her dangerous behaviors and conditions, but they failed to do so.

133.    Further, because this was at least N.V.'s third runaway since being in foster care, she was now considered a habitual runaway and OUR KIDS and CFCE were required to refer N.V. for a behavioral review or a comprehensive behavioral assessment by a Certified Behavior Analyst or Certified Associate Behavioral Analyst to develop an individualized plan and safe placement for the prevention of continued runway behavior, but they failed to do so.

134.    On or about November 22, 2016, due to OUR KIDS' failure to remedy the placement crisis resulting in continued placement limitations in Miami-Dade County, N.V. remained on a waiting list for specialized therapeutic foster care. OUR KIDS and CFCE placed N.V. in yet another traditional foster home which was a dangerous emergency placement for N.V. that could not meet her serious medical and mental health needs and could not meet N.V.'s immediate need for protection and safety. This was N.V.'s thirteenth placement in seven months and she was enrolled in at least her third school since being placed in care in April 2016.

135.    On or about November 29, 2016, CFCE observed N.V. get into a physical altercation with another child at school and threaten school staff when they intervened, again evidencing that N.V. needed an emergency therapeutic placement and intensive therapeutic services; however, CFCE failed to ensure N.V. received the necessary placement and services to keep her safe.

136.    On or about November 29, 2016, due to OUR KIDS' continued failure to remedy the placement crisis in Miami-Dade County resulting in continued placement limitations caused

by OUR KIDS' failure to take corrective action to recruit new foster homes, N.V. remained on a waiting list for specialized therapeutic foster care, so OUR KIDS and CFCE placed N.V. at HIS HOUSE, a dangerous group home for N.V. that could not meet her serious medical and mental health needs and could not meet N.V.'s immediate need for protection and safety. This was N.V.'s fourteenth placement in seven months.

137. On or before November 29, 2016, HIS HOUSE knew or should have known that:

    a. This was N.V.'s third time in foster care;

    b. N.V. had been sexually assaulted/sexually battered while in foster care in 2009; had a history of sexually reactive behaviors; and required a safety plan with her having her own room and being constantly supervised around other children to prevent further incidents of sexual abuse and sexually reactive behaviors;

    c. N.V. had a history of engaging in inappropriate sexual behaviors including: accessing pornography on her smart phone and computer; sending letters to boys offering to engage in sex acts for money; posting sexually explicit posts and videos on social media; sexting and sending sexually explicit photos of herself via text message and social media messenger, and needed to be supervised and monitored on the phone, on the internet, and on social media;

    d. N.V. had a significant mental health history with varying diagnoses over the years including: Adjustment Disorder with Disturbance of Conduct, Attention Deficit Hyperactivity Disorder; Oppositional Defiant Disorder; Generalized Anxiety Disorder; Post-Traumatic Stress Disorder; Dysthymic Disorder; Major Depressive Disorder; and Bipolar Disorder;

    e. N.V. had been Baker Acted for suicidal ideations in the past several times including earlier that month;

33

f. N.V. was on psychotropic medication including Vyvanse for ADHD and Sertraline for depression;

g. N.V. had a history of running away;

h. N.V. had exhibited defiant behaviors and refused to follow rules;

i. N.V. required specialized therapeutic and behavioral services due to her history of sexual behaviors, aggressive behaviors, running away, and mental health issues;

j. N.V. had been abusing substances;

k. N.V. had been suspended from school on multiple occasions and had been expelled from one school;

l. N.V. had been arrested for destroying property in one of her foster homes;

m. N.V. had a history of stealing, including stealing two cells phones from CFCE earlier that month;

n. N.V. required placement in medical foster care due to her sickle cell anemia diagnosis;

o. N.V. required specialized placement in therapeutic foster care due to a prior recommendation for this level of care earlier that month; and

p. N.V.'s mental health condition and at-risk behaviors posed a danger to herself and others.

138.    Given N.V.'s significant mental health and behavioral history, she should have been immediately denied admission to HIS HOUSE; however, HIS HOUSE accepted N.V. for placement at its group home despite knowledge that HIS HOUSE was a dangerous placement for N.V., could not meet N.V.'s serious medical and mental health needs, could not meet N.V.'s

immediate need for protection and safety, and that N.V. needed a higher level of care than HIS HOUSE could provide.

139.    On or about November 29, 2016, a safety plan was implemented for N.V. only identifying that she exhibited problematic sexual behavior and not identifying any of the alerts that had previously been given to her.  The safety plan required HIS HOUSE to monitor N.V.'s social media access; however, CFCE signed admission forms stating that N.V. could have a cell phone and that HIS HOUSE would not be responsible for monitoring cell phone activity.  The safety plan further required N.V. to have her own bedroom for her own safety and the safety of others, but she consistently shared bedrooms with other children.

140.    On or about November 30, 2016, N.V. got into another altercation with a student at school and the other student tried to shoot N.V. with a gun she had brought to school but the gun jammed.  N.V. was suspended from school for ten (10) days due to fighting.

141.    On or about December 8, 2016, OUR KIDS and CFCE knew that N.V. was again diagnosed with Major Depression and her Zoloft was increased.

142.    Also, on or before December 8, 2016, OUR KIDS and CFCE knew that N.V. continued to emotionally deteriorate as she previously had received A's and B's prior to entering foster care in April 2016 but was now receiving two F's in school, including one in math which was her best subject.

143.    While residing at HIS HOUSE, it was known by OUR KIDS, CFCE, and HIS HOUSE that N.V. continued to deteriorate emotionally and behaviorally, was often found in other residents' bedrooms, continued to engage in sexual activities, skipped school, used drugs, refused to take her psychotropic medication, and engaged in physical and verbal altercations with roommates and other peers.

144.    On or about December 10, 2016, OUR KIDS, CFCE, and HIS HOUSE knew that N.V.'s HIS HOUSE roommate physically assaulted N.V. by hitting her three times and N.V. did not defend herself.

145.    On or about December 19, 2016, N.V.'s mental health had deteriorated so significantly and her behaviors had escalated to the point that she was arrested for aggravated battery after throwing a pot of boiling water on another resident at HIS HOUSE resulting in burns to the other child and N.V. being discharged from HIS HOUSE.

146.    On or about December 19, 2016, DCF issued JANVIER, a new foster parent, a foster care license for three children at OUR KIDS' recommendation even though she had no experience dealing with children with behavior problems or more than one child at a time. JANVIER lived in a two-bedroom apartment with her fifteen-month-old son.

147.    On or about December 20, 2016, due to OUR KIDS' continued failure to remedy the placement crisis resulting in continued placement limitations, N.V. remained on a waiting list for specialized therapeutic foster care. Upon N.V.'s discharge from the Department of Juvenile Justice for her serious criminal offense of aggravated battery, OUR KIDS and CFCE placed N.V. in yet another traditional foster home that could not meet N.V.'s serious medical and mental health needs and could not meet N.V.'s immediate need for protection and safety. This was N.V.'s fifteenth placement in eight months and she only remained in this placement for one (1) day.

148.    On or about December 21, 2016, due to OUR KIDS' continued failure to remedy the placement crisis resulting in continued placement limitations in Miami-Dade County, only two days after JANVIER was licensed as a foster parent, OUR KIDS and CFCE placed N.V. in the inexperienced traditional foster home of JANVIER with no safety plan and no wrap around services as required. This was N.V.'s sixteenth placement in eight months. OUR KIDS and/or CFCE subsequently inappropriately placed two other foster children in JANVIER'S home

notwithstanding JANVIER'S lack of experience and capacity to foster these three (3) foster children, one being N.V., and notwithstanding that all three foster children would share a bedroom with an own en-suite bathroom in this home allowing for a total lack of supervision.

149.    At the time of N.V.'s placement, JANVIER knew or should have known that:

 a. This was N.V.'s third time in foster care;

 b. N.V. had been sexually assaulted/sexually battered while in foster care in 2009; had a history of sexually reactive behaviors; and required a safety plan with her having her own room and being constantly supervised around other children to prevent further incidents of sexual abuse and sexually reactive behaviors;

 c. N.V. had a history of engaging in inappropriate sexual behaviors including: accessing pornography on her smart phone and computer; sending letters to boys offering to engage in sexual acts for money; posting sexually explicit posts and videos on social media; sexting and sending sexually explicit photos of herself via text message and social media messenger, and needed to be supervised and monitored on the phone, on the internet, and on social media and all caregivers were Court Ordered to monitor N.V.'s cell phone, internet, and social media use;

 d. N.V. had a significant mental health history with varying diagnoses over the years including: Adjustment Disorder with Disturbance of Conduct, Attention Deficit Hyperactivity Disorder; Oppositional Defiant Disorder; Generalized Anxiety Disorder; Post-Traumatic Stress Disorder; Dysthymic Disorder; Major Depressive Disorder; and Bipolar Disorder;

 e. N.V. had been Baker Acted for suicidal ideations several times in the past including the prior month;

    f.  N.V. was on psychotropic medication including Vyvanse and Sertraline for depression;

    g.  N.V. had a history of running away;

    h.  N.V. had exhibited defiant behaviors and refused to follow rules;

    i.  N.V. required specialized therapeutic and behavioral services due to her history of sexual behaviors, aggressive behaviors, running away, and mental health issues;

    j.  N.V. had been abusing substances;

    k.  N.V. had been suspended from school on multiple occasions and had been expelled from one school;

    l.  N.V. had been arrested for destroying property in one of her foster homes;

    m.  N.V. had been arrested for aggravated battery only two days earlier for throwing boiling water on another child;

    n.  N.V. had a history of stealing, including stealing two cells phones from CFCE;

    o.  N.V. required placement in medical foster care due to her sickle cell anemia diagnosis;

    p.  N.V. required specialized placement in therapeutic foster care due to a prior recommendation for this level of care the prior month;

    q.  N.V.'s mental health condition and at-risk behaviors posed a danger to herself and others; and

    r.  JANVIER was not qualified for or capable of caring for N.V. due to N.V.'s significant needs.

150.    At all times material hereto, OUR KIDS, CFCE, and JANVIER knew that JANVIER had no experience in dealing with children with difficult behaviors like N.V., JANVIER

was only equipped to deal with a child with minor behavioral challenges, JANVIER was not qualified for or capable of caring for N.V.'s significant needs, especially with two other foster children and a biological toddler, and JANVIER'S home was a dangerous placement for N.V. that could not meet N.V.'s serious medical and mental health needs and could not meet N.V.'s immediate need for protection and safety.

151.    Upon information and belief, OUR KIDS and CFCE failed to inform JANVIER that N.V. was Court ordered to be supervised at all times while on the phone, internet, and social media for N.V.'s own protection.

152.    On or about January 5, 2017, OUR KIDS, CFCE, and JANVIER knew that N.V. sustained a black eye from being hit in the face by another foster child placed in JANVIER'S home and that JANVIER'S home was a dangerous placement for N.V. that could not meet her serious medical, mental health and emotional needs; however, OUR KIDS, CFCE, and JANVIER allowed N.V. to remain in this placement that was dangerous to N.V. with no wrap around services.

153.    Between January 7, 2017 and January 9, 2017, N.V. was hospitalized for sickle cell complications, which caused N.V. significant chronic pain and during her hospitalization, N.V. said she did not want to die.

154.    On or about January 10, 2017 and again on January 18, 2017, N.V.'s mother provided CFCE with multiple screen shots of inappropriate sexualized posts N.V. had made on social media, advised CFCE that N.V.'s behavior and actions were getting worse in foster care, and urged CFCE to intervene and prohibit N.V. from accessing social media; however CFCE refused to do so and said it was "up to [N.V.] to make better decisions" and all CFCE could do was "make sure [N.V.'s] basic needs are being met."

155.    N.V. needed to be immediately removed from JANVIER'S inexperienced foster home and placed in a medical foster home or a therapeutic placement that could meet N.V.'s

serious medical and mental health needs; however, OUR KIDS, CFCE, and JANVIER allowed N.V. to remain in this placement where she continued to deteriorate.

156.    On or about January 20, 2017, CFCE learned that JANVIER was not filling out N.V.'s medication log as required to track her psychotropic medication.

157.    Between April 18, 2016 and January 21, 2017, CFCE provided sporadic therapeutic services to N.V. and did not ensure she received the Court Ordered twice weekly therapy she needed due to her numerous inappropriate placements causing significant instability and further deterioration.

### GENERAL ALLEGATIONS RELATED TO DEATH

158.    On or about January 22, 2017, N.V. hung herself in the bathroom inside her bedroom at JANVIER'S home and died by suicide while live streaming on Facebook.

### COUNT I – NEGLIGENCE CLAIM AGAINST
### FLORIDA DEPARTMENT OF CHILDREN AND FAMILIES
### FOR DAMAGES UNRELATED TO DEATH (SURVIVAL CLAIM)

159.    N.V., who died on or about January 22, 2017, after this cause of action arose in her favor, but prior to the filing of this Complaint, would have been the plaintiff in this action if she had lived and not died by suicide on that date.

160.    This claim arises in negligence pursuant to § 46.021, Florida Statutes, relating to actions taken by DCF which did not cause N.V.'s death.

161.    Plaintiff hereby reavers and realleges paragraphs 1 through 157 as if fully set forth herein.

162.    All conditions precedent pursuant to § 768.28, Florida Statutes, have been performed.

163.    At all times material hereto, DCF, as the state agency charged with the non-delegable duty of ensuring the health, welfare, and safety of children in the state, had the following

non-delegable statutory, contractual, and common law duties:

  a. To keep N.V. safe while in its care, custody, and supervision;

  b. To use reasonable care in the investigation of abuse and neglect reports;

  c. To comply with Chapters 39 and 409 of the Florida Statutes, Florida Administrative Code, and DCF Operating Procedures regarding the health, welfare, and safety of N.V.;

  d. To investigate reports of abuse and/or neglect of N.V. when such reports were made to the Abuse Hotline;

  e. To ensure that all relevant collateral contacts, persons who have had contact with the children, the alleged perpetrator, or the family, and have direct knowledge or information regarding the family's situation, were made;

  f. To protect N.V. from further abuse, neglect, and victimization and immediately prevent further harm;

  g. To provide a safe, secure environment where N.V. was free from unreasonable risk of harm;

  h. To determine the protective, treatment, and ameliorative services necessary to safeguard and ensure N.V.'s safety and well-being and development, and cause the delivery of those services;

  i. To investigate the fitness of any proposed placement for N.V., taking into account her individualized physical, emotional, behavioral, and social needs, as well as her background and history;

  j. To ensure that all available information is provided to emergency shelters, group homes, and foster parents regarding the foster children placed therein, including whether the child had a history of sexual abuse, sexual acting out, and/or sexual aggression, to enable caregivers to implement all precautionary measures to keep all foster children in that placement safe, including N.V., pursuant to F.A.C. 65C-28.004 and DCF Operating Procedures 175-88 and 170-11;

  k. To ensure that N.V. timely received a psychosexual evaluation and sexual abuse treatment when identified as a victim of sexual abuse and/or a sexually reactive or aggressive child pursuant to F.A.C. 65C-28.004 and DCF Operating Procedures 175-88 and 170-11;

  l. To ensure safety plans, plans of care, and any other necessary safety measures were implemented and followed to ensure N.V. was not further sexually abused

and prevent sexually reactive behaviors pursuant to F.A.C. 65C-28.004 and DCF Operating Procedures 175-88, and 170-11;

m.  To ensure all necessary and appropriate assessments and evaluations for N.V. were completed in a timely manner, including, but not limited to, Level of Care Assessments, psychosexual evaluations, psychological evaluations, psychiatric evaluations, Suitability Assessments, and substance abuse evaluations;

n.  To ensure that all recommendations from assessors, evaluators, and other professionals regarding N.V., were followed and implemented in a timely manner;

o.  To ensure that N.V. consistently received appropriate services to meet her needs, including, but not limited to, individual counseling, education services, substance abuse services, behavioral services, targeted case management, and psychiatric treatment;

p.  To ensure all Court Orders regarding placement, services, supervision, and monitoring of N.V. were complied with;

q.  To ensure that N.V. was supervised at all times while using phones, internet, and social media;

r.  To outline a plan of care to handle any special management issues identified in the history and assessments to ensure that all foster children, including N.V. were safe, appropriately cared for, and adequately supervised;

s.  To properly report, investigate and take action on incidents of children in the custody and care of the State of Florida, including N.V., eloping and running away from its physical custody and/or their placements pursuant to F.A.C. 65C-30.019 and DCF Operating Procedure 175-85;

t.  To implement reasonable safeguards to prevent children in the custody of the State of Florida, including N.V., from eloping and running away, to immediately report all children known to be missing, including N.V., to law enforcement and the Court, among others, and to take all reasonable and necessary steps and action to take such children back into physical custody and place them in a safe, secure placement pursuant to F.A.C. 65C-30.019 and DCF Operating Procedure 175-85;

u.  To ensure that N.V. was assessed, referred for appropriate services, and placed in a safe placement each and every time she returned from runaway status pursuant to F.A.C. 65C-30.019, DCF Operating Procedure 175-85, and OKI OP No. 7000-60-002;

v.  To continually monitor licensed emergency shelters and group homes to ensure they were meeting children's needs for services and safety and to ensure their

compliance with Florida Statutes, Florida Administrative Code, and DCF Operating Procedures;

w. To continually monitor the performance of contracted agencies to ensure they were meeting children's needs for services and safety and to ensure their compliance with Florida Statutes, Florida Administrative Code, and DCF Operating Procedures;

x. To place contracted agencies, including OUR KIDS, on corrective action when their systemic deficiencies result in shortage of appropriate placements and services for children in the custody of the State and harm to said children; and

y. To ensure that contracted agencies, including OUR KIDS complied with corrective action plans to remedy systemic deficiencies including shortages of appropriate placements and services for children in the custody of the State or to immediately terminate their contract(s) for failure to comply with corrective action.

164.   DCF, through its agents and/or employees, breached said non-discretionary and non-delegable duties.

165.   As a direct and proximate result of the aforementioned breaches, N.V. suffered emotional harm and deteriorating mental health and was further subjected to sexual abuse, physical abuse, emotional abuse, and neglect, and suffered severe bodily harm and resulting pain and suffering, deterioration, discomfort, disability, mental anguish, loss of capacity for the enjoyment of life, and expenses of hospitalization, medical and nursing care and treatment, exacerbation, aggravation and/or activation of preexisting conditions or disease, and other reasonably foreseeable compensatory damages.

WHEREFORE, Plaintiff demands judgment against Defendant, FLORIDA DEPARTMENT OF CHILDREN AND FAMILIES, for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

## COUNT II – WRONGFUL DEATH CLAIM AGAINST FLORIDA DEPARTMENT OF CHILDREN AND FAMILIES

166.   Plaintiff, BERNARD PERLMUTTER, ESQ., as the duly appointed Personal

Representative of the ESTATE of N.V. also brings this action against DCF pursuant to §768.16, et. seq., Florida Statutes ("The Florida Wrongful Death Act"), on behalf of the deceased minor child's estate and the deceased minor child's beneficiaries: her natural mother (G.A. a/k/a G.C.), her natural father (Ni.V.), and/or four half siblings based upon any disclaimers, assignments, and/or as determined by Orders of the Probate Court.

167.     Plaintiff hereby reavers and realleges paragraphs 1 through 158 as if set forth fully herein.

168.     All conditions precedent pursuant to § 768.28, Florida Statutes, have been performed.

169.     At all times material hereto, the deceased minor child was 14 years of age.

170.     This claim arises in negligence under Florida law, relating to actions taken by DCF culminating in N.V. hanging herself in her foster home live on Facebook which resulted in her death on or about January 22, 2017, while under the care, custody, and supervision of DCF.

171.     While N.V. was residing in foster care from April 2016 through January 2017, DCF failed to ensure N.V.'s serious emotional, behavioral, and mental health needs were assessed; failed to ensure N.V. was provided with a safe stable placement that could meet her serious emotional, behavioral and mental health needs and keep her safe; and failed to ensure N.V. was adequately supervised, ultimately resulting in N.V.'s death on or about January 22, 2017.

172.     At all times material hereto, DCF, as the state agency charged with the non-delegable duty of ensuring the health, welfare, and safety of children in the state, had the following non-delegable statutory, contractual, and common law duties:

        a.   To keep N.V. safe while in its care, custody, and supervision;

        b.   To protect N.V. from further abuse, neglect, and victimization and immediately prevent further harm;

c. To provide a safe, secure environment where N.V. was free from unreasonable risk of harm;

d. To comply with Chapters 39 and 409 of the Florida Statutes, Florida Administrative Code, and DCF Operating Procedures, regarding the health, welfare, and safety of N.V.;

e. To determine the protective, treatment, and ameliorative services necessary to safeguard and ensure N.V.'s safety and well-being and development, and cause the delivery of those services;

f. To investigate the fitness of any proposed placement for N.V., taking into account her individualized physical, emotional, behavioral, and social needs, as well as her background and history;

g. To continually assess the adequacy and safety of N.V.'s particular placements;

h. To ensure that all available information is provided to foster parents regarding the foster children placed therein, including whether the child had a history of sexual abuse, sexual acting out, and/or sexual aggression, to enable caregivers to implement all precautionary measures to keep all foster children in that placement safe, including N.V., pursuant to F.A.C. 65C-28.004 and DCF Operating Procedures 175-88 and 170-11;

i. To ensure safety plans, plans of care, and any other necessary safety measures were implemented and followed to prevent sexually reactive behaviors pursuant to F.A.C. 65C-28.004 and DCF Operating Procedures 175-88 and 170-11;

j. To ensure all necessary and appropriate assessments and evaluations for N.V. were completed in a timely manner, including, but not limited to, Level of Care Assessments, psychological evaluations, psychiatric evaluations, Suitability Assessments, and substance abuse evaluations;

k. To ensure that all recommendations from assessors, evaluators, and other professionals regarding N.V., were followed and implemented in a timely manner;

l. To ensure that N.V. consistently received appropriate services to meet her needs, including, but not limited to, individual counseling, education services, substance abuse services, behavioral services, targeted case management, and psychiatric treatment;

m. To ensure all Court Orders regarding placement, services, supervision, and monitoring of N.V. were complied with;

n. To ensure that N.V. was supervised at all times while using phones, internet, and social media;

o.  To outline a plan of care to handle any special management issues identified in the history and assessments to ensure that all foster children, including N.V. were safe, appropriately cared for, and adequately supervised;

p.  To ensure that N.V. was assessed, referred for appropriate services, and placed in a safe placement when she returned from runaway status pursuant to F.A.C. 65C-30.019 and DCF Operating Procedure 175-85;

q.  To continually monitor licensed emergency shelters and group homes to ensure they were meeting children's needs for services and safety and to ensure their compliance with Florida Statutes, Florida Administrative Code, and DCF Operating Procedures;

r.  To continually monitor the performance of contracted agencies to ensure they were meeting children's needs for services and safety and to ensure their compliance with Florida Statutes, Florida Administrative Code, and DCF Operating Procedures;

s.  To place contracted agencies, including OUR KIDS, on corrective action when their systemic deficiencies result in shortage of appropriate placements and services for children in the custody of the State and harm to said children; and

t.  To ensure that contracted agencies, including OUR KIDS, complied with corrective action plans to remedy systemic deficiencies including shortages of appropriate placements and services for children in the custody of the State or to immediately terminate their contract(s) for failure to comply with corrective action.

173.  DCF, through its agents and/or employees, breached said non-discretionary and non-delegable duties.

174.  As a direct and proximate result of the aforementioned breaches, N.V. hung herself in the bathroom of her bedroom in JANVIER'S foster home while live streaming on Facebook and was otherwise unsupervised and N.V. died while in the care and custody of DCF; N.V.'s survivors have suffered and will continue to suffer mental pain and suffering and loss of companionship, comfort, society, services, and filial consortium; and N.V.'s estate has suffered and will continue to suffer medical expenses.  These losses are either permanent or continuing in nature.

WHEREFORE, Plaintiff demands judgment against Defendant, FLORIDA DEPARTMENT OF CHILDREN AND FAMILIES, for compensatory damages, costs, all damages allowable under § 768.21, Florida Statutes, and all other such relief as the Court may deem just and proper.

**COUNT III – NEGLIGENCE CLAIM AGAINST**
**OUR KIDS OF MIAMI-DADE/MONROE, INC.**
**FOR DAMAGES UNRELATED TO DEATH (SURVIVAL CLAIM)**

175.    N.V., who died on or about January 22, 2017, after this cause of action arose in her favor, but prior to the filing of this Complaint, would have been the plaintiff in this action if she had lived and not died by suicide on that date.

176.    This claim arises in negligence pursuant to § 46.021, Florida Statutes, relating to actions taken by OUR KIDS which did not cause N.V.'s death.

177.    Plaintiff hereby reavers and realleges paragraphs 1 through 157 as if fully set forth herein.

178.    At all times material hereto, OUR KIDS, as the lead community-based agency contracted to provide child welfare services in Miami-Dade County, had the following statutory, contractual, and common law duties:

        a.  To keep N.V. safe while in its care, custody, and supervision;

        b.  To protect N.V. from further abuse, neglect, and victimization;

        c.  To provide a safe, secure environment where N.V. was free from unreasonable risk of harm;

        d.  To comply with Chapters 39 and 409 of the Florida Statutes, Florida Administrative Code, DCF Operating Procedures, and OUR KIDS' Policies and Procedures regarding the health, welfare, and safety of N.V.;

        e.  To establish and maintain an adequate system for case management and ensuring appropriate oversight of subcontracted agencies;

f.  To continually monitor the performance of subcontracted agencies to ensure they were meeting children's needs for services and safety;

g.  To have available an appropriate continuum of services to address N.V.'s mental health and behavioral needs;

h.  To have available an appropriate continuum of placements including medical foster homes and specialized therapeutic foster homes for children in its system of care, including N.V.;

i.  To search for medical foster homes and specialized therapeutic foster homes out of county when such placements do not exist within OUR KIDS' system of care;

j.  To investigate the fitness of any proposed placement for N.V., taking into account her individualized physical, emotional, behavioral, and social needs, as well as her background and history;

k.  To continually assess the adequacy and safety of N.V.'s particular placements;

l.  To ensure that all available information is provided to emergency shelters, group homes, and foster parents regarding the foster children placed therein, including whether the child had a history of sexual abuse, sexual acting out, and/or sexual aggression, to enable caregivers to implement all precautionary measures to keep all foster children in that placement safe, including N.V., pursuant to F.A.C. 65C-28.004, DCF Operating Procedures 175-88 and 170-11, and OKI OP No. 6000-10-013;

m.  To ensure that N.V. timely received a psychosexual evaluation and sexual abuse treatment when identified as a victim of sexual abuse and/or a sexually reactive or aggressive child pursuant to F.A.C. 65C-28.004, DCF Operating Procedures 175-88 and 170-11, and OKI OP No. 6000-10-013;

n.  To ensure safety plans, plans of care, and any other necessary safety measures were implemented and followed to ensure N.V. was not further sexually abused and prevent sexually reactive behaviors pursuant to F.A.C. 65C-28.004, DCF Operating Procedures 175-88 and 170-011, and OKI OP No. 6000-10-013;

o.  To ensure all necessary and appropriate assessments and evaluations for N.V. were completed in a timely manner, including, but not limited to, Level of Care Assessments, psychosexual evaluations, psychological evaluations, psychiatric evaluations, Suitability Assessments, and substance abuse evaluations;

p.  To ensure that all recommendations from assessors, evaluators, and other professionals regarding N.V., were followed and implemented in a timely manner;

q. To ensure that N.V. consistently received appropriate services to meet her needs, including, but not limited to, individual counseling, education services, substance abuse services, behavioral services, targeted case management, and psychiatric treatment;

r. To ensure all Court Orders regarding placement, services, supervision, and monitoring of N.V. were complied with;

s. To ensure that N.V. was supervised at all times while using phones, internet, and social media;

t. To outline a plan of care to handle any special management issues identified in the history and assessments to ensure that all foster children, including N.V. were safe, appropriately cared for, and adequately supervised;

u. To properly report, investigate and take action on incidents of children in the custody and care of the State of Florida, including N.V., eloping and running away from its physical custody and/or their placements pursuant to F.A.C. 65C-30.019, DCF Operating Procedure 175-85, and OKI OP No. 7000-60-002;

v. To implement reasonable safeguards to prevent children in the custody of the State of Florida, including N.V., from eloping and running away, to immediately report all children known to be missing, including N.V., to law enforcement, the Court, and DCF, among others, and to take all reasonable and necessary steps and action to take such children back into physical custody and place them in a safe, secure placement pursuant to F.A.C. 65C-30.019, DCF Operating Procedure 175-85, and OKI OP No. 7000-60-002; and

w. To ensure that N.V. was assessed, referred for appropriate services, and placed in a safe placement each and every time she returned from runaway status pursuant to F.A.C. 65C-30.019, DCF Operating Procedure 175-85, and OKI OP No. 7000-60-002;

179.    OUR KIDS, through its agents and/or employees, breached said non-discretionary and non-delegable duties.

180.    As a direct and proximate result of the aforementioned breaches, N.V. suffered emotional harm and deteriorating mental health and was further subjected to sexual abuse, physical abuse, emotional abuse, and neglect, and suffered severe bodily harm and resulting pain and suffering, deterioration, discomfort, disability, mental anguish, loss of capacity for the enjoyment of life, and expenses of hospitalization, medical and nursing care and treatment, exacerbation,

aggravation and/or activation of preexisting conditions or disease, and other reasonably foreseeable compensatory damages.

WHEREFORE, Plaintiff demands judgment against Defendant, OUR KIDS OF MIAMI-DADE/MONROE, INC., for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

## COUNT IV – CULPABLE NEGLIGENCE CLAIM AGAINST OUR KIDS OF MIAMI-DADE/MONROE, INC. FOR DAMAGES UNRELATED TO DEATH (SURVIVAL CLAIM)

181.    N.V., who died on or about January 22, 2017, after this cause of action arose in her favor, but prior to the filing of this Complaint, would have been the plaintiff in this action if she had lived and not died by suicide on that date.

182.    This claim arises in negligence pursuant to § 46.021, Florida Statutes, relating to actions taken by OUR KIDS which did not cause N.V.'s death.

183.    Plaintiff hereby reavers and realleges paragraphs 1 through 157 as if fully set forth herein.

184.    The cumulative actions on the part of Defendant OUR KIDS demonstrate that OUR KIDS acted with willful and wanton disregard of human rights, safety, and/or property in its provision of protective supervision to N.V. and/or acted with reckless indifference or grossly careless disregard of human life in its provision of protective supervision to N.V. based upon the following facts:

> a.    No later than March 2011, OUR KIDS was on notice of deficiencies in the quality of CFCE's case management and in OUR KIDS' oversight of CFCE as identified by the Barahona outside and independent Investigative Team following the death of Nubia Barahona and the egregious abuse of her brother. OUR KIDS was required to address these deficiencies via corrective action, but

OUR KIDS failed to do so, and the same deficiencies still existed throughout this case including superficial observations of N.V.; lack of integration of information sharing and communication among the professionals involved in this case; unclear case ownership and case integrations among OUR KIDS and CFCE; insufficient attention to health care, mental health care, and educational support; failure to act in the face of significant evidence that N.V. was receiving inadequate care in her various placements; conflicting professional opinions without any resolution; overall substandard quality of documentation by case managers; failure to implement recommendations from Level of Care Assessments and in this case failure to even obtain a Level of Care Assessment during N.V.'s last stay in foster care between April 2016 and January 2017 as was required; disregard in the need to document and monitor N.V.'s safety and wellbeing; and serious symptoms of depression identified in evaluations which did not result in therapy as recommended and required by Court Order.

b. In February, 2014, OUR KIDS knew that it operated a child welfare system of care that was in crisis with insufficient placements to appropriately meet foster children's needs, including N.V., because it had a shortage of foster homes, medical foster homes, specialized therapeutic foster homes and other appropriate placements;

c. In 2014, OUR KIDS knew that it operated a child welfare system of care that was dangerous to children with insufficient mental health and behavioral services to meet foster children's needs, including N.V.;

d. Prior to 2014 and through January 2017, OUR KIDS over-utilized the placement of children, including N.V., in untrained foster homes, hotels,

dangerous emergency shelters and group homes with knowledge that these children would be exposed to harms including sexual abuse, physical violence, substance use, and deteriorating mental health;

e.   OUR KIDS failed to ensure N.V. was immediately placed in a medical foster home when recommended by professional judgment due to her sickle cell anemia diagnosis;

f.   OUR KIDS failed to ensure N.V. was immediately placed in a specialized therapeutic foster home when recommended by professional judgment;

g.   By April 18, 2016, when NV came back into foster care, OUR KIDS had not taken corrective active actions to address systemic deficiencies including lack of placements and services and continued to fail to ensure the safety of children as there was still a placement gridlock and crisis resulting in large numbers of children, including N.V. being exposed to the substantial risk of serious harm;

h.   OUR KIDS failed to ensure N.V. immediately and continuously received individual counseling, behavior analyst services, psychiatric treatment, and targeted case management when she was placed in foster care despite knowledge that these services had been recommended and were necessary to ensure her safety and prevent her from deteriorating;

i.   OUR KIDS failed to ensure that safety plans were implemented and followed to prevent children identified as sexual abuse victims or who were sexually reactive and/or aggressive were safe while in foster care and protected from sexual abuse and continued sexualized behavior, including N.V.; and

j.   OUR KIDS continuously failed to ensure that when children returned from runaway status, including N.V., that they were immediately assessed to

determine appropriate placement and additional services resulting in harm to children, including N.V.

185.    As a direct and proximate result of the aforementioned breaches, N.V. suffered emotional harm and deteriorating mental health and was further subjected to sexual abuse, physical abuse, emotional abuse, and neglect, and suffered severe bodily harm and resulting pain and suffering, deterioration, discomfort, disability, mental anguish, loss of capacity for the enjoyment of life, and expenses of hospitalization, medical and nursing care and treatment, exacerbation, aggravation and/or activation of preexisting conditions or disease, and other reasonably foreseeable compensatory damages.

186.    The caps and limitations of §§ 409.1671 and 409.993, Florida Statutes, are inapplicable to N.V.'s damages because of OUR KIDS' reckless, willful and/or dangerous acts and because OUR KIDS did not meet other statutory requirements and conditions regarding appropriate coverage as to avail itself of said caps.

WHEREFORE, Plaintiff demands judgment for damages in excess of the statutory caps found in §§ 409.1671 and 409.993, Florida Statutes, against Defendant, OUR KIDS OF MIAMI-DADE/MONROE, INC.

### COUNT V – 42 U.S.C. § 1983 CLAIM AGAINST OUR KIDS OF MIAMI-DADE/MONROE, INC. FOR DAMAGES UNRELATED TO DEATH (SURVIVAL CLAIM)

187.    Plaintiff reavers and realleges paragraphs 1 through 157 as if fully set forth herein.

188.    This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation, under color of state law, of guaranteed rights under the Fourteenth Amendment of the United States Constitution which did not cause N.V.'s death.

189.    At all times material hereto, OUR KIDS was a "person" and was acting under the color of state law within the meaning of 42 U.S.C. § 1983.

190. At all times material hereto, pursuant to §§ 409.1671(1)(f)(1) and 409.993(1)(a), Florida Statutes, although foster care was a public function traditionally within the exclusive prerogative of the State of Florida, OUR KIDS assumed responsibility as a private non-governmental entity.

191. At all times material hereto, it was clearly established that children in the physical custody of the state foster care system, including N.V., had the constitutionally protected right to be safe and free from unreasonable risk of harm and to receive services in accordance with professional judgment.

192. On or before February 2014, OUR KIDS established and enforced a custom, policy, or practice that resulted in a placement crisis by failing to have or obtain sufficient placements, including medical foster care placements and specialized therapeutic foster care placements, for foster children so that children could be placed in accordance with professional judgment.

193. OUR KIDS established and enforced a custom, policy, or practice of over-utilizing emergency shelters and group homes for foster children.

194. OUR KIDS established and enforced a custom, policy, or practice of allowing foster children with known mental, behavioral, medical and emotional problems to be placed in emergency shelters, group homes, and traditional foster homes, notwithstanding that it was exposing such children to numerous dangers.

195. OUR KIDS established and enforced a custom, policy, or practice that failed to ensure that mental health, substance abuse, behavioral needs, and medical needs of foster children in state custody were assessed, evaluated, and treated in accordance with professional judgment.

196. OUR KIDS established and enforced a custom, policy, or practice on a widespread basis that failed to require recommendations from psychological evaluations, psychiatric evaluations, mental health evaluations, Level of Care Assessments, and Suitability Assessments,

54

to be followed in accordance with professional judgment, thereby exposing children in its care to the substantial risk of serious harm.

197.   OUR KIDS established and enforced a custom, policy, or practice which did not have adequate foster care placements to meet the placement needs of foster children in foster care because it had a shortage of medical foster homes and specialized therapeutic foster homes.

198.   OUR KIDS established and enforced a custom, policy, or practice of failing to appropriately monitor its subcontracted providers and of deliberately failing to learn of the dangers that children in its custody were exposed to.

199.   OUR KIDS established and enforced a custom, policy, or practice of allowing foster children with known mental, behavioral, emotional, and substance abuse problems to be placed in dangerous group homes, emergency shelter placements, and foster homes from where they could, and did, run away, notwithstanding that it was exposing such children to dangers and the substantial risk of serious harm on the streets including criminal acts, drug use, engaging in risky sexual behaviors, and becoming victims of human trafficking.

200.   OUR KIDS established and enforced a custom, policy, or practice of failing to appropriately staff cases and assess children to ensure appropriate services, placement, and a plan of care to prevent further runaway episodes and deterioration while in care.

201.   OUR KIDS established and enforced a custom, policy, or practice of failing to ensure Court Orders from the Dependency Court were complied with regarding placement, services, supervision, and monitoring of children in foster care.

202.   OUR KIDS was responsible for, but failed to ensure that children under its care, including N.V., had a complete and accurate plan of care that addressed their needs consistent with their mental health evaluations and their level of care and failed to continually assess and determine any need for service referrals in accordance with professional judgment.

203.    At all times material hereto, OUR KIDS did not provide services or placements to N.V., who was in the physical and legal custody of OUR KIDS, in accordance with professional judgment, and was deliberately indifferent and/or acted with reckless disregard to N.V.'s health, safety, and welfare and Constitutional and federal rights, including, without limitation, utilizing dangerous emergency shelters for children in its care; utilizing dangerous group homes for children in its care; utilizing dangerous traditional foster homes for children in its care; failing to ensure that N.V. was placed in a safe environment that could meet her needs, failing to ensure a sufficient safety plan was implemented and followed to protect N.V. from sexual abuse while in care and sexually reactive and aggressive behaviors; failing to ensure that N.V. received individual counseling as necessary, as recommended, and as Court ordered; failing to ensure that N.V. received behavior analyst services as necessary and recommended; failing to ensure N.V. was placed in a medical foster home when recommended; failing to ensure N.V. was placed in a specialized therapeutic foster home when recommended; failing to have appropriate and available placements for foster children in Miami-Dade County; failing to staff N.V.'s case and determine the need for enhanced services and change of placement each time N.V. returned from being on runaway; failing to ensure that N.V. received a Level of Care Assessment when she entered foster care in 2016; failing to ensure that N.V. received a Suitability Assessment as necessary and recommended; failing to ensure N.V. received updated mental health evaluations as necessary when her grades declined in school, she was suspended and expelled from school and she was arrested twice for increasingly violent acts; failing to ensure that N.V. received a substance abuse evaluation and treatment as necessary and recommended; failing to ensure N.V. was given proper assessments and services to prevent her from running away; failing to ensure Court Orders for supervision of N.V.'s cell phone, internet, and social media use were complied with; failing to monitor its subcontractors to ensure child safety, and by directly exposing N.V. to sexual abuse,

physical abuse, emotional abuse and neglect and causing her mental health condition to deteriorate and exposing N.V. to unnecessary risk of harm.

204. By April 18, 2016, when NV came back into care, OUR KIDS had not addressed and taken corrective active actions to address and ensure that the safety of children as there still remained a placement gridlock and crisis and large numbers of children, including N.V., were exposed to the substantial risk of serious harm.

205. OUR KIDS established and maintained an unconstitutional system of care that resulted in the widespread harm to foster children, including N.V., because it abdicated its constitutional and statutory duties to ensure that each child in its care was free from harm resulting in a child welfare system that blatantly ignored and/or deliberately failed to learn of the plethora of red flags, dangers and warning signs that N.V.'s needs were not being properly addressed and provided for.

206. OUR KIDS violated N.V.'s Constitutional rights and exposed her to a substantial risk of serious harm by:

> a. Accepting responsibility for the care of N.V. knowing that N.V. was in immediate need of safe medical placement, but repeatedly authorizing placement in hotels, emergency shelters, group homes, and traditional foster homes, which were dangerous placements for N.V. that could not protect N.V. from harm.

> b. Accepting responsibility for the care of N.V. knowing that N.V. was in immediate need of safe therapeutic placement, but repeatedly authorizing placement in hotels, emergency shelters, group homes, and traditional foster homes, which were dangerous placements for N.V. that could not protect N.V. from harm.

   c. Accepting responsibility for the custody and care of N.V. knowing that N.V. was at high risk for danger, elopement and running away, had run away multiple times previously, and that she intended to run away from various placements, yet OUR KIDS repeatedly authorized placement of N.V. in group homes, emergency shelters, and foster care placements which were dangerous placements for N.V. which could not protect N.V. from harm.

   d. Accepting responsibility for the care of N.V. knowing that N.V. was in immediate need of therapeutic, behavioral, mental health, psychiatric, psychological, emotional, substance abuse, and residential services but failing to ensure that she was assessed and referred for these immediate services.

   e. Accepting responsibility for the care of N.V. and exposing her to substantial risk of serious harm by failing to ensure a sufficient safety plan was implemented and followed to protect N.V. from sexual abuse an older foster child and preventing further sexually reactive and/or aggressive behaviors.

   f. Allowing N.V.'s behaviors to escalate and mental health to significantly deteriorate over the three times she was in foster care when it exposed her to sexual abuse, physical abuse, emotional abuse, and neglect in foster care placements and failed to provide her with appropriate therapeutic placements and services to address her emotional needs.

207. OUR KIDS was deliberately indifferent to the serious psychiatric and psychological needs of children in its care and custody.

208. At all times that OUR KIDS was taking the actions described herein, it was clearly established that children in the physical custody of the state foster care system, like N.V., have the

Constitutionally and federally protected right to receive mental health services in accordance with professional judgment and not be exposed to deterioration of mental health and emotional harm.

209.    Despite possessing the authority and means to remedy the unconstitutional treatment of the child and seek safe therapeutic placement and services to address N.V.'s serious mental health needs, OUR KIDS was deliberately indifferent to N.V.'s right to receive treatment for her serious mental health needs by failing to timely address N.V.'s emotional, behavioral, and mental health needs, and failing to ensure N.V. received safe, stable, therapeutic placement, which subjected N.V. to further psychological harm and deterioration.

210.    Despite possessing the authority and means to remedy the unconstitutional treatment of N.V. and seek safe and secure therapeutic placement and services to address N.V.'s serious mental health needs, OUR KIDS was deliberately indifferent to N.V.'s right to receive treatment for her serious mental health needs by failing to timely assess her medical, mental health, behavioral, psychological, substance abuse, and emotional needs, failing to timely address her medical, mental health, behavioral, psychological, substance abuse, and emotional needs, failing to ensure N.V. received safe, stable, medical, and therapeutic placement, and the substantial risk that N.V.'s condition would continue to deteriorate and OUR KIDS knowingly and recklessly disregarded an excessive risk to her health and safety which subjected N.V. to further psychological harm and deterioration.

211.    Despite possessing the authority and means to remedy the unconstitutional treatment of N.V., OUR KIDS was deliberately indifferent to N.V.'s medical, mental health, behavioral, psychological, emotional, and substance abuse needs and the substantial risk that N.V.'s condition would continue to deteriorate and OUR KIDS knowingly and recklessly disregarded an excessive risk to her health and safety.

212.    At all times material hereto, OUR KIDS knew of the dangers and risks of harm to

foster children and children in state care, and to N.V. in particular, when on runaway status and/or away from their placement without authorization, including, but not necessarily limited to, physical and sexual assault, rape, pregnancy, sexually transmitted diseases, drug and alcohol use, homelessness, prostitution, abduction and kidnaping, domestic violence, human trafficking, murder, suicide, and death (said dangers having been extensively studied, reported upon, and are well known to child welfare professionals throughout the State of Florida and nationwide). Despite this knowledge, in violation of multiple Florida Statutes, Florida Administrative Code rules, DCF Operating Procedures, and OUR KIDS Operating Procedures, OUR KIDS failed to ensure N.V. was placed in a safe placement or a secure facility, failed to ensure N.V. was placed in a safe placement or a secure facility when she returned from runaway, failed to prevent N.V. from eloping and running away, and failed to properly handle a runaway child or a child in danger and at risk of eloping. Rather, OUR KIDS perceived and treated N.V. as a "throwaway child" and actually encouraged, assisted, and/or allowed N.V. to elope and run away, despite the known dangers and risk to N.V.

213.   OUR KIDS took said actions described herein knowing it was exposing children who were in State custody, including N.V., to a substantial risk of serious harm.

214.   OUR KIDS violated N.V.'s fundamental right of physical safety subjecting her to a heightened risk of danger.

215.   OUR KIDS' actions and failures to act were done with knowledge that said actions would deprive N.V. of her constitutional rights to be free from harm.

216.   Despite possessing the authority and means to remedy the unconstitutional treatment of N.V. and to seek and secure treatment and a safe, stable, and secure placement to address N.V.'s serious mental health needs, OUR KIDS was deliberately indifferent to the

substantial risk that N.V.'s condition would and did continue to deteriorate and knowingly and recklessly disregarded an excessive risk to her health and safety.

217.    As a direct and proximate result of OUR KIDS' deliberate indifference and/or recklessness, N.V. suffered emotional harm and deteriorating mental health and was further subjected to sexual abuse, physical abuse, emotional abuse, and neglect, and suffered severe bodily harm and resulting pain and suffering, deterioration, discomfort, disability, mental anguish, loss of capacity for the enjoyment of life, and expenses of hospitalization, medical and nursing care and treatment, exacerbation, aggravation and/or activation of preexisting conditions or disease, and other reasonably foreseeable compensatory damages.

218.    Plaintiff and N.V.'s Estate are obligated to the undersigned firms for payment of attorney's fees and costs, and seeks recovery of reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiff prays that this Honorable Court enter a judgment in favor of Plaintiff against Defendant, OUR KIDS OF MIAMI-DADE/MONROE, INC., for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

**COUNT VI – WRONGFUL DEATH CLAIM AGAINST**
**OUR KIDS OF MIAMI-DADE/MONROE, INC.**

219.    Plaintiff, BERNARD PERLMUTTER, ESQ., as the duly appointed Personal Representative of the ESTATE of N.V. also brings this action against OUR KIDS pursuant    to §768.16, et. seq., Florida Statutes ("The Florida Wrongful Death Act"), on behalf of the deceased minor child's estate and the deceased minor child's beneficiaries: her natural mother (G.A. a/k/a G.C.), her natural father (Ni.V.), and/or four half siblings based upon any disclaimers, assignments, and/or as determined by Orders of the Probate Court.

220. Plaintiff hereby reavers and realleges paragraphs 1 through 158 as if set forth fully herein.

221. At all times material hereto, the deceased minor child was 14 years of age.

222. This claim arises in negligence under Florida law, relating to actions taken by OUR KIDS culminating in N.V. hanging herself in her foster home live on Facebook which resulted in her death on or about January 22, 2017, while under the care, custody, and supervision of OUR KIDS.

223. While N.V. was residing in foster care from April 2016 through January 2017, OUR KIDS failed to assess N.V.'s serious emotional, behavioral, and mental health needs, failed to provide N.V. with a safe placement that could meet her serious emotional, behavioral and mental health needs and keep her safe, and failed to adequately supervise N.V., ultimately resulting in N.V.'s death on or about January 22, 2017.

224. At all times material hereto, OUR KIDS, as the lead community-based agency contracted to provide child welfare services in Miami-Dade County, had the following statutory, contractual, and common law duties:

a. To keep N.V. safe while in its care, custody, and supervision;

b. To protect N.V. from further abuse, neglect, and victimization;

c. To provide a safe, secure environment where N.V. was free from unreasonable risk of harm;

d. To comply with Chapters 39 and 409 of the Florida Statutes, Florida Administrative Code, DCF Operating Procedures, and OUR KIDS' Policies and Procedures regarding the health, welfare, and safety of N.V.;

e. To establish and maintain an adequate system for case management and ensuring appropriate oversight of subcontracted agencies;

f. To continually monitor the performance of subcontracted agencies to ensure they were meeting children's needs for services and safety;

g.  To have available an appropriate continuum of services to address N.V.'s mental health and behavioral needs;

h.  To have available an appropriate continuum of placements including medical foster homes and specialized therapeutic foster homes for children in its system of care, including N.V.;

i.  To search for medical foster homes and specialized therapeutic foster homes out of county when such placements do not exist within OUR KIDS' system of care;

j.  To investigate the fitness of any proposed placement for N.V., taking into account her individualized physical, emotional, behavioral, and social needs, as well as her background and history;

k.  To continually assess the adequacy and safety of N.V.'s particular placements;

l.  To ensure that all available information is provided to foster parents regarding the foster children placed therein, including whether the child had a history of sexual abuse, sexual acting out, and/or sexual aggression, to enable caregivers to implement all precautionary measures to keep all foster children in that placement safe, including N.V., pursuant to F.A.C. 65C-28.004, DCF Operating Procedures 175-88 and 170-11, and OKI OP No. 6000-10-013;

m.  To ensure safety plans, plans of care, and any other necessary safety measures were implemented and followed to prevent sexually reactive behaviors pursuant to F.A.C. 65C-28.004, DCF Operating Procedures 175-88 and 170-11, and OKI OP No. 6000-10-013;

n.  To ensure all necessary and appropriate assessments and evaluations for N.V. were completed in a timely manner, including, but not limited to, Level of Care Assessments, psychological evaluations, psychiatric evaluations, Suitability Assessments, and substance abuse evaluations;

o.  To ensure that all recommendations from assessors, evaluators, and other professionals regarding N.V., were followed and implemented in a timely manner;

p.  To ensure that N.V. consistently received appropriate services to meet her needs, including, but not limited to, individual counseling, education services, substance abuse services, behavioral services, targeted case management, and psychiatric treatment;

q.  To ensure all Court Orders regarding placement, services, supervision, and monitoring of N.V. were complied with;

r. To ensure that N.V. was supervised at all times while using phones, internet, and social media;

s. To outline a plan of care to handle any special management issues identified in the history and assessments to ensure that all foster children, including N.V. were safe, appropriately cared for, and adequately supervised; and

t. To ensure that N.V. was assessed, referred for appropriate services, and placed in a safe placement when she returned from runaway status pursuant to F.A.C. 65C-30.019, DCF Operating Procedure 175-85, and OKI OP No. 7000-60-002;

225. OUR KIDS, through its agents and/or employees, breached said non-discretionary and non-delegable duties.

226. As a direct and proximate result of the aforementioned breaches, N.V. hung herself in the bathroom of her bedroom in JANVIER'S foster home while live streaming on Facebook and was otherwise unsupervised and N.V. died while in the care and custody of OUR KIDS; N.V.'s survivors have suffered and will continue to suffer mental pain and suffering and loss of companionship, comfort, society, services, and filial consortium; and N.V.'s estate has suffered and will continue to suffer medical expenses. These losses are either permanent or continuing in nature.

WHEREFORE, Plaintiff demands judgment against Defendant, OUR KIDS OF MIAMI-DADE/MONROE, INC., for compensatory damages, costs, all damages allowable under § 768.21, Florida Statutes, and all other such relief as the Court may deem just and proper.

## COUNT VII – CULPABLE NEGLIGENCE CLAIM AGAINST OUR KIDS OF MIAMI-DADE/MONROE, INC. FOR WRONGFUL DEATH

227. Plaintiff, BERNARD PERLMUTTER, ESQ., as the duly appointed Personal Representative of the ESTATE of N.V. also brings this action against OUR KIDS pursuant to §768.16, et. seq., Florida Statutes ("The Florida Wrongful Death Act"), on behalf of the deceased minor child's estate and the deceased minor child's beneficiaries: her natural mother (G.A. a/k/a

G.C.), her natural father (Ni.V.), and/or four half siblings based upon any disclaimers, assignments, and/or as determined by Orders of the Probate Court.

228. Plaintiff hereby reavers and realleges paragraphs 1 through 158 as if set forth fully herein.

229. At all times material hereto, the deceased minor child was 14 years of age.

230. This claim arises in negligence under Florida law, relating to actions taken by OUR KIDS culminating in N.V. hanging herself in her foster home live on Facebook which resulted in her death on or about January 22, 2017, while under the care, custody, and supervision of OUR KIDS.

231. The cumulative actions on the part of Defendant OUR KIDS demonstrate that OUR KIDS acted with willful and wanton disregard of human rights, safety, and/or property in its provision of protective supervision to N.V. and/or acted with reckless indifference or grossly careless disregard of human life in its provision of protective supervision to N.V. and such acts resulted in N.V.'s death based upon the following facts:

  a. No later than March 2011, OUR KIDS was on notice of deficiencies in the quality of CFCE's case management and in OUR KIDS' oversight of CFCE as identified by the Barahona Investigative Team following the death of Nubia Barahona and the egregious abuse of her brother. OUR KIDS was required to address these deficiencies via corrective action, but OUR KIDS failed to do so, and the same deficiencies still existed throughout this case including superficial observations of N.V.; lack of integration of information sharing and communication among the professionals involved in this case; unclear case ownership and case integrations among OUR KIDS and CFCE; insufficient attention to health care, mental health care, and educational support; failure to

act in the face of significant evidence that N.V. was receiving inadequate care in her various placements; conflicting professional opinions without any resolution; overall substandard quality of documentation by case managers; failure to implement recommendations from Level of Care Assessments and in this case failure to even obtain a Level of Care Assessment during N.V.'s last stay in foster care between April 2016 and January 2017 as was required; disregard in the need to document and monitor N.V.'s safety and wellbeing; and serious symptoms of depression identified in evaluations which did not result in therapy as recommended and required by Court Order.

b. In February 2014, OUR KIDS knew that it operated a child welfare system of care that was in crisis with insufficient placements to appropriately meet foster children's needs, including N.V., because it had a shortage of foster homes, medical foster homes, specialized therapeutic foster homes, and other appropriate placements;

c. In 2014, OUR KIDS knew that it operated a child welfare system of care that was dangerous to children with insufficient mental health and behavioral services to meet foster children's needs, including N.V.;

d. Prior to 2014 and through January 2017, OUR KIDS over-utilized the placement of children, including N.V., in untrained foster homes, hotels, dangerous emergency shelters and group homes with knowledge that these children would be exposed to harms including deteriorating mental health;

e. OUR KIDS failed to ensure N.V. was immediately placed in a medical foster home in 2016 and 2017 when recommended by professional judgment due to her sickle cell anemia diagnosis;

f.  OUR KIDS failed to ensure N.V. was immediately placed in a specialized therapeutic foster home in 2016 and 2017 when recommended by professional judgment;

g.  By April 18, 2016 and through January 22, 2017, OUR KIDS had not taken corrective actions to address systemic deficiencies including lack of placements and services and continued to fail to ensure the safety of children as there was still a placement gridlock and crisis resulting in large numbers of children, including N.V., being exposed to the substantial risk of serious harm;

h.  OUR KIDS failed to ensure N.V. immediately and continuously received individual counseling, behavior analyst services, psychiatric treatment, and targeted case management when she was placed in foster care despite knowledge that these services had been recommended and were necessary to ensure her safety and prevent her from deteriorating; and

i.  Between April 2016 and December 2016, OUR KIDS authorized placement of N.V. in sixteen different placements, none of which were therapeutic, which resulted in N.V.'s significant and rapid mental health deterioration culminating in the final placement with JANVIER, a foster parent who had been licensed for only two days at the time N.V. was placed with her, had no experience dealing with children with even slight mental health and behavior problems let alone the significant problems N.V. had, was unable to provide the level of supervision and monitoring N.V. required to keep her safe including monitoring N.V.'s phone, internet, and social media usage as Court ordered, and whose home N.V. died by suicide in while live on Facebook unsupervised.

232.    As a direct and proximate cause of OUR KIDS willful and wanton disregard of N.V. and culpably negligent acts, N.V. hung herself in the bathroom of her bedroom in JANVIER'S foster home while live streaming on Facebook and was otherwise unsupervised and N.V. died while in the care and custody of OUR KIDS; N.V.'s survivors have suffered and will continue to suffer mental pain and suffering and loss of companionship, comfort, society, services, and filial consortium; and N.V.'s estate has suffered and will continue to suffer medical expenses. The losses are either permanent or continuing in nature.

233.    The caps and limitations of §§ 409.1671 and 409.993, Florida Statutes, are inapplicable to these damages claims because of OUR KIDS' reckless, willful and/or dangerous acts proximately caused N.V.'s death and because OUR KIDS did not meet other statutory requirements and conditions regarding appropriate coverage as to avail itself of said caps.

WHEREFORE, Plaintiff demands judgment for damages in excess of the statutory caps found in §§ 409.1671 and 409.993, Florida Statutes, against Defendant, OUR KIDS OF MIAMI-DADE/MONROE, INC.

### COUNT VIII – 42 U.S.C. § 1983 CLAIM AGAINST OUR KIDS OF MIAMI-DADE/MONROE, INC. FOR WRONGFUL DEATH

234.    Plaintiff reavers and realleges paragraphs 1 through 158 as if fully set forth herein.

235.    This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation, under color of state law, of guaranteed rights under the Fourteenth Amendment of the United States Constitution which caused N.V.'s death.

236.    At all times material hereto, OUR KIDS was a "person" and was acting under the color of state law within the meaning of 42 U.S.C. § 1983.

237.    At all times material hereto, pursuant to §§ 409.1671(1)(f)(1) and 409.993(1)(a), Florida Statutes, although foster care was a public function traditionally within the exclusive

prerogative of the State of Florida, OUR KIDS assumed responsibility as a private non-governmental entity.

238.    At all times material hereto, it was clearly established that children in the physical custody of the state foster care system, including N.V., had the constitutionally protected right to be safe and free from unreasonable risk of harm and to receive services in accordance with professional judgment.

239.    OUR KIDS established and enforced a custom, policy, or practice that resulted in a placement crisis by failing to have or obtain sufficient placements, including medical foster care placements and specialized therapeutic foster care placements, for foster children so that children could be placed in accordance with professional judgment.

240.    OUR KIDS established and enforced a custom, policy, or practice of allowing foster children with known mental, behavioral, medical and emotional problems to be placed in traditional foster homes, notwithstanding that it was exposing such children to numerous dangers.

241.    OUR KIDS established and enforced a custom, policy, or practice that failed to ensure that mental health, substance abuse, behavioral needs, and medical needs of foster children in state custody were assessed, evaluated, and treated in accordance with professional judgment.

242.    OUR KIDS established and enforced a custom, policy, or practice on a widespread basis that failed to require recommendations from psychological evaluations, psychiatric evaluations, mental health evaluations, Level of Care Assessments, and Suitability Assessments, to be followed in accordance with professional judgment, thereby exposing children in its care to the substantial risk of serious harm.

243.    OUR KIDS established and enforced a custom, policy, or practice which did not have adequate foster care placements to meet the placement needs of foster children in foster care because it had a shortage of medical foster homes and specialized therapeutic foster homes.

244.    OUR KIDS established and enforced a custom, policy, or practice of failing to appropriately monitor its subcontracted providers and of deliberately failing to learn of the dangers that children in its custody were exposed to.

245.    OUR KIDS established and enforced a custom, policy, or practice of failing to appropriately staff cases and assess children who returned from runaway to ensure appropriate services, placement, and a plan of care to prevent further deterioration while in care.

246.    OUR KIDS established and enforced a custom, policy, or practice of failing to ensure Court Orders from the Dependency Court were complied with regarding placement, services, supervision, and monitoring of children in foster care.

247.    OUR KIDS was responsible for, but failed to ensure that children under its care, including N.V., had a complete and accurate plan of care that addressed their needs consistent with their mental health evaluations and their level of care and failed to continually assess and determine any need for service referrals in accordance with professional judgment.

248.    At all times material hereto, OUR KIDS did not provide services or placements to N.V., who was in the physical and legal custody of OUR KIDS, in accordance with professional judgment, and was deliberately indifferent and/or acted with reckless disregard to the N.V.'s health, safety, and welfare and Constitutional and federal rights, including, without limitation, utilizing dangerous traditional foster homes for children in its care who were determined to require a higher level of care including medical foster care of therapeutic foster care; failing to ensure that N.V. was placed in a safe environment that could meet her needs; failing to ensure a sufficient safety plan was implemented and followed to protect N.V. from engaging in sexually reactive and aggressive behaviors; failing to ensure that N.V. received individual counseling as necessary, as recommended, and as Court ordered; failing to ensure that N.V. received behavior analyst services as necessary and recommended; failing to ensure N.V. was placed in a medical foster home when

recommended; failing to ensure N.V. was placed in a specialized therapeutic foster home when recommended; failing to have appropriate and available placements for foster children in Miami-Dade County; failing to staff N.V.'s case and determine the need for enhanced services and change of placement each time N.V. returned from runaway; failing to ensure that N.V. received a Level of Care Assessment when she entered foster care in 2016; failing to ensure that N.V. received a Suitability Assessment as necessary and recommended; failing to ensure N.V. received updated mental health evaluations as necessary when her grades declined in school, she was suspended and expelled from school and she was arrested twice for increasingly violent acts; failing to ensure that N.V. received a substance abuse evaluation and treatment as necessary and recommended; failing to ensure Court Orders for supervision of N.V.'s cell phone, internet, and social media use were complied with; failing to monitor its subcontractors to ensure child safety; and authorizing placement of N.V. in sixteen different placements, none of which were therapeutic, between April 2016 and December 2016 which resulted in N.V.'s significant and rapid mental health deterioration culminating in the final placement with JANVIER, a foster parent who had been licensed for only two days at the time N.V. was placed with her, had no experience dealing with children with even slight mental health and behavior problems let alone the significant problems N.V. had, was unable to provide the level of supervision and monitoring N.V. required to keep her safe including monitoring N.V.'s phone, internet, and social media usage as Court ordered, and whose home N.V. died by suicide in while live on Facebook unsupervised, thereby directly exposing N.V. to unnecessary risk of harm and death.

249.    OUR KIDS established and maintained an unconstitutional system of care that resulted in the widespread harm to foster children, including N.V., because it abdicated its constitutional and statutory duties to ensure that each child in its care was free from harm resulting in a child welfare system that blatantly ignored and/or deliberately failed to learn of the plethora

of red flags, dangers and warning signs that N.V.'s needs were not being properly addressed and provided for.

250.     OUR KIDS violated N.V.'s Constitutional rights and exposed her to a substantial risk of serious harm by:

      a. Accepting responsibility for the care of N.V. knowing that N.V. was in immediate need of safe medical placement, but repeatedly authorizing placement in hotels, emergency shelters, group homes, and traditional foster homes, which were dangerous placements for N.V. that could not protect N.V. from harm.

      b. Accepting responsibility for the care of N.V. knowing that N.V. was in immediate need of safe therapeutic placement, but repeatedly authorizing placement in hotels, emergency shelters, group homes, and traditional foster homes, which were dangerous placements for N.V. that could not protect N.V. from harm.

      c. Accepting responsibility for the custody and care of N.V. knowing that N.V. was at high risk for danger, elopement and running away, had run away multiple times previously, and that she intended to run away from various placements, yet OUR KIDS repeatedly authorized placement of N.V. in group homes, emergency shelters, and foster care placements which were dangerous placements for N.V. which could not protect N.V. from harm.

      d. Accepting responsibility for the care of N.V. knowing that N.V. was in immediate need of therapeutic, behavioral, mental health, psychiatric, psychological, emotional, substance abuse, and residential services but failing to ensure that she was assessed and referred for these immediate services.

e.  Accepting responsibility for the care of N.V. and exposing her to substantial risk of serious harm by failing to ensure a sufficient safety plan was implemented and followed to prevent further sexually reactive and/or aggressive behaviors.

f.  Allowing N.V.'s behaviors to escalate and mental health to significantly deteriorate between April 2016 and January 2017 by failing to provide her with appropriate therapeutic placements and services to address her emotional needs.

g.  Authorizing placement of N.V. in sixteen different placements, none of which were therapeutic, between April 2016 and December 2016 which resulted in N.V.'s significant and rapid mental health deterioration culminating in the final placement with JANVIER, a foster parent who had been licensed for only two days at the time N.V. was placed with her, had no experience dealing with children with even slight mental health and behavior problems let alone the significant problems N.V. had, was unable to provide the level of supervision and monitoring N.V. required to keep her safe including monitoring N.V.'s phone, internet, and social media usage as Court ordered, and whose home N.V. died by suicide in while live on Facebook unsupervised.

251.  OUR KIDS was deliberately indifferent to the serious psychiatric and psychological needs of children in its care and custody.

252.  At all times that OUR KIDS was taking the actions described herein, it was clearly established that children in the physical custody of the state foster care system, like N.V., have the Constitutionally and federally protected right to receive mental health services in accordance with professional judgment and not be exposed to deterioration of mental health and emotional harm.

253.    Despite possessing the authority and means to remedy the unconstitutional treatment of the child and seek safe therapeutic placement and services to address N.V.'s serious mental health needs, OUR KIDS was deliberately indifferent to N.V.'s right to receive treatment for her serious mental health needs by failing to timely address N.V.'s emotional, behavioral, and mental health needs, and failing to ensure N.V. received safe, stable, therapeutic placement, which subjected N.V. to further psychological harm, deterioration, and death.

254.    Despite possessing the authority and means to remedy the unconstitutional treatment of N.V. and seek safe and secure therapeutic placement and services to address N.V.'s serious mental health needs, OUR KIDS was deliberately indifferent to N.V.'s right to receive treatment for her serious mental health needs by failing to timely assess her medical, mental health, behavioral, psychological, substance abuse, and emotional needs, failing to timely address her medical, mental health, behavioral, psychological, substance abuse, and emotional needs, failing to ensure N.V. received safe, stable, medical, and therapeutic placement, and the substantial risk that N.V.'s condition would continue to deteriorate and OUR KIDS knowingly and recklessly disregarded an excessive risk to her health and safety which subjected N.V. to further psychological harm and deterioration and death.

255.    Despite possessing the authority and means to remedy the unconstitutional treatment of N.V., OUR KIDS was deliberately indifferent to N.V.'s medical, mental health, behavioral, psychological, emotional, and substance abuse needs and the substantial risk that N.V.'s condition would continue to deteriorate and OUR KIDS knowingly and recklessly disregarded an excessive risk to her health and safety.

256.    OUR KIDS took said actions described herein knowing it was exposing children who were in State custody, including N.V., to a substantial risk of serious harm.

257.    OUR KIDS violated N.V.'s fundamental right of physical safety subjecting her to a heightened risk of danger.

258.    OUR KIDS' actions and failures to act were done with knowledge that said actions would deprive N.V. of her constitutional rights to be free from harm.

259.    Despite possessing the authority and means to remedy the unconstitutional treatment of N.V. and to seek and secure treatment and a safe, stable, and secure placement to address N.V.'s serious mental health needs, OUR KIDS was deliberately indifferent to the substantial risk that N.V.'s condition would and did continue to deteriorate and knowingly and recklessly disregarded an excessive risk to her health and safety.

260.    As a direct and proximate result of OUR KIDS' deliberate indifference and/or recklessness, N.V. hung herself in the bathroom of her bedroom in JANVIER'S foster home while live streaming on Facebook and otherwise unsupervised and N.V. died while in the care and custody of OUR KIDS; N.V.'s survivors have suffered and will continue to suffer mental pain and suffering and loss of companionship, comfort, society, services, and filial consortium; and N.V.'s estate has suffered and will continue to suffer medical expenses. These losses are either permanent or continuing in nature.

261.    Plaintiff and N.V.'s Estate are obligated to the undersigned firms for payment of attorney's fees and costs, and seeks recovery of reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiff prays that this Honorable Court enter a judgment in favor of Plaintiff against Defendant, OUR KIDS OF MIAMI-DADE/MONROE, INC., for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

**COUNT IX – NEGLIGENCE CLAIM AGAINST
CHARLEE OF DADE COUNTY, INC.
FOR DAMAGES UNRELATED TO DEATH (SURVIVAL CLAIM)**

262.    N.V., who died on or about January 22, 2017, after this cause of action arose in her favor, but prior to the filing of this Complaint, would have been the plaintiff in this action if she had lived and not died by suicide on that date.

263.    This claim arises in negligence pursuant to § 46.021, Florida Statutes, relating to actions taken by CHARLEE which did not cause N.V.'s death.

264.    Plaintiff hereby reavers and realleges paragraphs 1-10, 14, 16-50 as if fully set forth herein.

265.    At all times material hereto, CHARLEE, as the sub-contracted agency contracted to provide child welfare services in Miami-Dade County, including case management services, therapeutic services, behavioral services, and targeted case management services, had the following statutory, contractual, and common law duties:

    a.  To keep N.V. safe while in its care, custody, and supervision;

    b.  To protect N.V. from further abuse, neglect, and victimization;

    c.  To provide a safe, secure environment where N.V. was free from unreasonable risk of harm;

    d.  To comply with Chapters 39 and 409 of the Florida Statutes, Florida Administrative Code, DCF Operating Procedures, OUR KIDS' Policies and Procedures, and CHARLEE Policies and Procedures regarding the health, welfare, and safety of N.V.;

    e.  To have available an appropriate continuum of services to address N.V.'s mental health and behavioral needs;

    f.  To investigate the fitness of any proposed placement for N.V., taking into account her individualized physical, emotional, behavioral, and social needs, as well as her background and history;

    g.  To continually assess the adequacy and safety of N.V.'s particular placements;

h. To ensure that all available information is provided to foster parents regarding the foster children placed therein, including whether the child had a history of sexual abuse, sexual acting out, and/or sexual aggression, to enable caregivers to implement all precautionary measures to keep all foster children in that placement safe, including N.V., pursuant to F.A.C. 65C-28.004, DCF Operating Procedure 175-88 and OKI OP No. 6000-10-013;

i. To ensure that N.V. timely received a psychosexual evaluation and sexual abuse treatment when identified as a victim of sexual abuse and/or a sexually reactive or aggressive child pursuant to F.A.C. 65C-28.004, DCF Operating Procedure 175-88 and OKI OP No. 6000-10-013;

j. To ensure safety plans, plans of care, and any other necessary safety measures were implemented and followed to ensure N.V. was not further sexually abused and prevent sexually reactive behaviors pursuant to F.A.C. 65C-28.004, DCF Operating Procedure 175-88 and OKI OP No. 6000-10-013;

k. To ensure all necessary and appropriate assessments and evaluations for N.V. were completed in a timely manner, including, but not limited to, Level of Care Assessments, psychosexual evaluations, psychological evaluations, and psychiatric evaluations;

l. To ensure that all recommendations from assessors, evaluators, and other professionals regarding N.V., were followed and implemented in a timely manner;

m. To ensure that N.V. consistently received appropriate services to meet her needs, including, but not limited to, individual counseling, behavioral services, targeted case management, and psychiatric treatment;

n. To ensure all Court Orders regarding placement, services, supervision, and monitoring of N.V. were complied with; and

o. To outline a plan of care to handle any special management issues identified in the history and assessments to ensure that all foster children, including N.V. were safe, appropriately cared for, and adequately supervised.

266. CHARLEE, through its agents and/or employees, breached said duties.

267. As a direct and proximate result of the aforementioned breaches, N.V. suffered emotional harm and deteriorating mental health and was further subjected to sexual abuse/sexual assault/sexual battery, physical abuse, emotional abuse, and neglect, and suffered severe bodily harm and resulting pain and suffering, deterioration, discomfort, disability, mental anguish, loss

of capacity for the enjoyment of life, and expenses of hospitalization, medical and nursing care and treatment, exacerbation, aggravation and/or activation of preexisting conditions or disease, and other reasonably foreseeable compensatory damages.

WHEREFORE, Plaintiff demands judgment against Defendant, CHARLEE OF DADE COUNTY, INC., for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

**COUNT X – CULPABLE NEGLIGENCE CLAIM AGAINST
CHARLEE OF DADE COUNTY, INC.
FOR DAMAGES UNRELATED TO DEATH (SURVIVAL CLAIM)**

268. N.V., who died on or about January 22, 2017, after this cause of action arose in her favor, but prior to the filing of this Complaint, would have been the plaintiff in this action if she had lived and not died by suicide on that date.

269. This claim arises in negligence pursuant to § 46.021, Florida Statutes, relating to actions taken by CHARLEE which did not cause N.V.'s death.

270. Plaintiff hereby reavers and realleges paragraphs 1-10, 14, 16-50 as if fully set forth herein.

271. The cumulative actions on the part of Defendant CHARLEE demonstrate that CHARLEE acted with willful and wanton disregard of human rights, safety, and/or property in its provision of case management services, therapeutic services, behavioral services, and targeted case management services to N.V. and/or acted with reckless indifference or grossly careless disregard of human life in its provision of services to N.V. based upon the following facts:

> a. CHARLEE knew that it operated a child welfare system of care with insufficient placements to appropriately meet foster children's needs, including N.V.;

b. CHARLEE knew that it operated a child welfare system of care with insufficient mental health and behavioral services to meet foster children's needs, including N.V.;

c. Between 2009 and 2010, CHARLEE continuously failed to implement and follow safety plans for N.V. to prevent her from being sexually abused and engaging sexually reactive and aggressive behaviors despite knowledge that N.V. was sexually reactive and/or aggressive, was vulnerable to sexual abuse and/or sexualized behaviors, and required constant supervision around other children, resulting in N.V.'s repeated sexual assault/sexually battery on multiple occasions by an older foster child residing in the MOSQUERA foster home and N.V.'s continued and increasing sexualized behaviors;

d. CHARLEE failed to immediately ensure N.V. was removed from MOSQUERA'S foster home when it knew MOSQUERA was physically and emotionally abusing N.V., MOSEQUER was failing to take N.V. to necessary sexual abuse therapy to address her sexualized behaviors and vulnerability for further sexual abuse, and MOSQUERA was otherwise unable and/or unwilling to protect N.V. from further harm and sexual abuse; and

e. CHARLEE failed to ensure N.V. immediately and continuously received individual counseling including sexual abuse counseling, behavior analyst services, psychiatric treatment, and targeted case management when she was placed in foster care and otherwise under CHARLEE'S protective supervision, despite knowledge that these services had been recommended and were necessary to ensure her safety and prevent her from deteriorating.

272.    As a direct and proximate result of the aforementioned breaches, N.V. suffered emotional harm and deteriorating mental health and was further subjected to sexual abuse/assault/battery, physical abuse, emotional abuse, and neglect, and suffered severe bodily harm and resulting pain and suffering, deterioration, discomfort, disability, mental anguish, loss of capacity for the enjoyment of life, and expenses of hospitalization, medical and nursing care and treatment, exacerbation, aggravation and/or activation of preexisting conditions or disease, and other reasonably foreseeable compensatory damages.

273.    The caps and limitations of §§ 409.1671 and 409.993, Florida Statutes, are inapplicable to N.V.'s damages because of CHARLEE'S reckless, willful and/or dangerous acts.

WHEREFORE, Plaintiff demands judgment for damages in excess of the statutory caps found in §§ 409.1671 and 409.993, Florida Statutes, against Defendant, CHARLEE OF DADE COUNTY, INC.

**COUNT XI – NEGLIGENCE CLAIM AGAINST
THE CHILDREN'S HOME SOCIETY OF FLORIDA
FOR DAMAGES UNRELATED TO DEATH (SURVIVAL CLAIM)**

274.    N.V., who died on or about January 22, 2017, after this cause of action arose in her favor, but prior to the filing of this Complaint, would have been the plaintiff in this action if she had lived and not died by suicide on that date.

275.    This claim arises in negligence pursuant to § 46.021, Florida Statutes, relating to actions taken by CHS which did not cause N.V.'s death.

276.    Plaintiff hereby reavers and realleges paragraphs 1-10, 14, 16-48 as if fully set forth herein.

277.    At all times material hereto, CHS, as the sub-contracted agency responsible for the licensure, re-licensure, supervision and monitoring of the MOSQUERA foster home, had the following statutory, contractual, and common law duties:

a.  To keep N.V. safe while residing in the MOSQUERA foster home;

b.  To protect N.V. from further abuse, neglect, and victimization while residing in the MOSQUERA foster home;

c.  To provide a safe, secure environment where N.V. was free from unreasonable risk of harm in the MOSQUERA foster home;

d.  To comply with Chapters 39 and 409 of the Florida Statutes, Florida Administrative Code, DCF Operating Procedures, OUR KIDS' Policies and Procedures, and CHS Policies and Procedures regarding the licensure, re-licensure, supervision and monitoring of the MOSQUERA foster home, and the health, welfare, and safety of N.V.;

e.  To investigate the fitness of MOSQUERA for placement of N.V., taking into account her individualized physical, emotional, behavioral, and social needs, as well as her background and history;

f.  To continually assess the adequacy and safety of N.V.'s placement in the MOSQUERA foster home;

g.  To ensure that all available information was provided to MOSQUERA regarding the foster children placed therein, including whether the child had a history of sexual abuse, sexual acting out, and/or sexual aggression, to enable MOSQUERA to implement all precautionary measures to keep all children in that placement safe, including N.V., pursuant to F.A.C. 65C-28.004, DCF Operating Procedure 175-88 and OKI OP No. 6000-10-013;

h.  To ensure safety plans, plans of care, and any other necessary safety measures were implemented and followed to ensure N.V. was not further sexually abused and prevent sexually reactive behaviors pursuant to F.A.C. 65C-28.004, DCF Operating Procedure 175-88 and OKI OP No. 6000-10-013;

i.  To outline a plan of care to handle any special management issues identified in the history and assessments to ensure that all children residing in the MOSQUERA foster home, including N.V. were safe, appropriately cared for, and adequately supervised;

j.  To recommend denial, suspension, and/or revocation of MOSQUERA'S foster home license when it was verified that she had physically abused N.V. resulting in physical injury;

k.  To recommend denial, suspension, and/or revocation of MOSQUERA'S foster home license when it was known that she was emotionally abusing N.V. and the she was unable and/or unwilling to follow safety plans, protect N.V. from sexual assault/sexual battery and engaging in sexually reactive and/or

aggressive behaviors, and was unable and/or unwilling to take N.V. to necessary sexual abuse therapy; and

l.  To ensure that N.V. was immediately removed from MOSQUERA'S foster home when it was known that MOSQUERA was unable and/unwilling to protect N.V. from further harm;

278.  CHS, through its agents and/or employees, breached said duties.

279.  As a direct and proximate result of the aforementioned breaches, N.V. suffered emotional harm and deteriorating mental health and was further subjected to sexual abuse/assault/battery, physical abuse, emotional abuse, and neglect, and suffered severe bodily harm and resulting pain and suffering, deterioration, discomfort, disability, mental anguish, loss of capacity for the enjoyment of life, and expenses of hospitalization, medical and nursing care and treatment, exacerbation, aggravation and/or activation of preexisting conditions or disease, and other reasonably foreseeable compensatory damages.

WHEREFORE, Plaintiff demands judgment against Defendant, THE CHILDREN'S HOME SOCIETY OF FLORIDA, for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

**COUNT XII – NEGLIGENCE CLAIM AGAINST
THE CENTER FOR FAMILY AND CHILD ENRICHMENT, INC.
FOR DAMAGES UNRELATED TO DEATH (SURVIVAL CLAIM)**

280.  N.V., who died on or about January 22, 2017, after this cause of action arose in her favor, but prior to the filing of this Complaint, would have been the plaintiff in this action if she had lived and not died by suicide on that date.

281.  This claim arises in negligence pursuant to § 46.021, Florida Statutes, relating to actions taken by CFCE which did not cause N.V.'s death.

282.  Plaintiff hereby reavers and realleges paragraphs 1 through 157 as if fully set forth herein.

283.   At all times material hereto, CFCE, as the sub-contracted agency contracted to provide child welfare services in Miami-Dade County, including case management services, therapeutic services, behavioral services, and targeted case management services, had the following statutory, contractual, and common law duties:

     a.   To keep N.V. safe while in its care, custody, and supervision;

     b.   To protect N.V. from further abuse, neglect, and victimization;

     c.   To provide a safe, secure environment where N.V. was free from unreasonable risk of harm;

     d.   To comply with Chapters 39 and 409 of the Florida Statutes, Florida Administrative Code, DCF Operating Procedures, OUR KIDS' Policies and Procedures, and CFCE Policies and Procedures regarding the health, welfare, and safety of N.V.;

     e.   To have available an appropriate continuum of services to address N.V.'s mental health and behavioral needs;

     f.   To investigate the fitness of any proposed placement for N.V., taking into account her individualized physical, emotional, behavioral, and social needs, as well as her background and history;

     g.   To continually assess the adequacy and safety of N.V.'s particular placements;

     h.   To ensure that all available information is provided to emergency shelters, group homes, and foster parents regarding the foster children placed therein, including whether the child had a history of sexual abuse, sexual acting out, and/or sexual aggression, to enable caregivers to implement all precautionary measures to keep all foster children in that placement safe, including N.V., pursuant to F.A.C. 65C-28.004, DCF Operating Procedures 175-88 and 170-11, and OKI OP No. 6000-10-013;

     i.   To ensure that N.V. received sexual abuse treatment when identified as a victim of sexual abuse and/or a sexually reactive or aggressive child pursuant to F.A.C. 65C-28.004, DCF Operating Procedures 175-88 and 170-11, and OKI OP No. 6000-10-013;

     j.   To ensure safety plans, plans of care, and any other necessary safety measures were implemented and followed to ensure N.V. was not further sexually abused and prevent sexually reactive and/or aggressive behaviors pursuant to F.A.C. 65C-28.004, DCF Operating Procedures 175-88 and 170-11, and OKI OP No. 6000-10-013;

k.  To ensure all necessary and appropriate assessments and evaluations for N.V. were completed in a timely manner, including, but not limited to, Level of Care Assessments, psychosexual evaluations, psychological evaluations, psychiatric evaluations, Suitability Assessments, and substance abuse evaluations;

l.  To ensure that all recommendations from assessors, evaluators, and other professionals regarding N.V., were followed and implemented in a timely manner;

m.  To ensure that N.V. consistently received appropriate services to meet her needs, including, but not limited to, individual counseling, education services, substance abuse services, behavioral services, targeted case management, and psychiatric treatment;

n.  To ensure all Court Orders regarding placement, services, supervision, and monitoring of N.V. were complied with;

o.  To ensure that N.V. was supervised at all times while using phones, internet, and social media;

p.  To outline a plan of care to handle any special management issues identified in the history and assessments to ensure that all foster children, including N.V. were safe, appropriately cared for, and adequately supervised;

q.  To properly report, investigate and take action on incidents of children in the custody and care of the State of Florida, including N.V., eloping and running away from its physical custody and/or their placements pursuant to F.A.C. 65C-30.019, DCF Operating Procedure 175-85, and OKI OP No. 7000-60-002;

r.  To implement reasonable safeguards to prevent children in the custody of the State of Florida, including N.V., from eloping and running away, to immediately report all children known to be missing, including N.V., to law enforcement, the Court, and DCF, among others, and to take all reasonable and necessary steps and action to take such children back into physical custody and place them in a safe, secure placement pursuant to F.A.C. 65C-30.019, DCF Operating Procedure 175-85, and OKI OP No. 7000-60-002; and

s.  To ensure that N.V. was assessed, referred for appropriate services, and placed in a safe placement each and every time she returned from runaway status pursuant to F.A.C. 65C-30.019, DCF Operating Procedure 175-85, and OKI OP No. 7000-60-002;

284.  CFCE, through its agents and/or employees, breached said non-discretionary and non-delegable duties.

285.    As a direct and proximate result of the aforementioned breaches, N.V. suffered emotional harm and deteriorating mental health and was further subjected to sexual abuse, sexually reactive and/or aggressive behaviors, physical abuse, emotional abuse, and neglect, and suffered severe bodily harm and resulting pain and suffering, deterioration, discomfort, disability, mental anguish, loss of capacity for the enjoyment of life, and expenses of hospitalization, medical and nursing care and treatment, exacerbation, aggravation and/or activation of preexisting conditions or disease, and other reasonably foreseeable compensatory damages.

WHEREFORE, Plaintiff demands judgment against Defendant, THE CENTER FOR FAMILY AND CHILD ENRICHMENT, INC., for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

## COUNT XIII – CULPABLE NEGLIGENCE CLAIM AGAINST THE CENTER FOR FAMILY AND CHILD ENRICHMENT, INC. FOR DAMAGES UNRELATED TO DEATH (SURVIVAL CLAIM)

286.    N.V., who died on or about January 22, 2017, after this cause of action arose in her favor, but prior to the filing of this Complaint, would have been the plaintiff in this action if she had lived and not died by suicide on that date.

287.    This claim arises in negligence pursuant to § 46.021, Florida Statutes, relating to actions taken by CFCE which did not cause N.V.'s death.

288.    Plaintiff hereby reavers and realleges paragraphs 1 through 157 as if fully set forth herein.

289.    The cumulative actions on the part of Defendant CFCE demonstrate that CFCE acted with willful and wanton disregard of human rights, safety, and/or property in its provision of protective supervision to N.V. and/or acted with reckless indifference or grossly careless disregard of human life in its provision of protective supervision to N.V. based upon the following facts:

a. No later than March 2011, CFCE was on notice of deficiencies in the quality of its case management as identified by the Barahona Investigative Team following the death of Nubia Barahona and the egregious abuse of her brother. CFCE was required to address these deficiencies via corrective action, but CFCE failed to do so, and the same deficiencies still existed throughout this case including superficial observations of N.V.; lack of integration of information sharing and communication among the professionals involved in this case; unclear case ownership and case integration among OUR KIDS and CFCE; insufficient attention to health care, mental health care, and educational support; failure to act in the face of significant evidence that N.V. was receiving inadequate care in her various placements; conflicting professional opinions without any resolution; overall substandard quality of documentation by case managers; failure to implement recommendations from Level of Care Assessments and in this case failure to even obtain a Level of Care Assessment during N.V.'s last stay in foster care between April 2016 and January 2017 as was required; disregard in the need to document and monitor N.V.'s safety and wellbeing; and serious symptoms of depression identified in evaluations which did not result in therapy as recommended and required by Court Order.

b. CFCE failed to ensure N.V. was immediately placed in a medical foster home when recommended by professional judgment due to her sickle cell anemia diagnosis;

c. CFCE failed to ensure N.V. was immediately placed in a specialized therapeutic foster home when recommended by professional judgment;

d.  CFCE failed to ensure N.V. immediately and continuously received individual counseling, behavior analyst services, psychiatric treatment, and targeted case management when she was placed in foster care in 2014, 2016 and 2017, despite knowledge that these services had been recommended and were necessary to ensure her safety and prevent her from deteriorating;

e.  CFCE failed to ensure that safety plans were implemented and followed to prevent children identified as sexual abuse victims or who were sexually reactive and/or aggressive were safe while in foster care and protected from continued sexually reactive and/or aggressive behavior, including N.V.;

f.  CFCE continuously failed to ensure that when children returned from runaway status, including N.V., that they were immediately assessed to determine appropriate placement and additional services resulting in harm to children, including N.V.;

g.  CFCE continuously failed to ensure that N.V. was in a placement that could meet her mental health needs and instead allowed N.V. to spend days in the CFCE office and nights in hotels with CFCE staff for at least two weeks in 2014, allowed N.V. to be placed in traditional foster homes that could not and did not protect her from harm, and allowed her to be placed in emergency shelters and group homes which were dangerous for her;

h.  CFCE continuously failed to inform N.V.'s foster parents that there was a Court Order for N.V. to be supervised and monitored while on the phone, internet, and social media resulting in caregivers being uninformed and unable to provide N.V. with the level of care and supervision she required, and which was Court Ordered; and

i.  CFCE deliberately ignored Court Orders, including one requiring supervision of N.V. while on the phone, internet, and social media and when concerns were brought to CFCE's attention about N.V.'s improper sexual conduct and excessive social media use, such concerns were minimized and dismissed, resulting in N.V. having ongoing access to these devices and methods of communication.

290.    As a direct and proximate result of the aforementioned breaches, N.V. suffered emotional harm and deteriorating mental health and was further subjected to sexual abuse, physical abuse, emotional abuse, and neglect, and suffered severe bodily harm and resulting pain and suffering, deterioration, discomfort, disability, mental anguish, loss of capacity for the enjoyment of life, and expenses of hospitalization, medical and nursing care and treatment, exacerbation, aggravation and/or activation of preexisting conditions or disease, and other reasonably foreseeable compensatory damages.

291.    The caps and limitations of §§ 409.1671 and 409.993, Florida Statutes, are inapplicable to N.V.'s damages because of CFCE'S reckless, willful and/or dangerous acts.

WHEREFORE, Plaintiff demands judgment for damages in excess of the statutory caps found in §§ 409.1671 and 409.993, Florida Statutes, against Defendant, THE CENTER FOR FAMILY AND CHILD ENRICHMENT, INC.

### COUNT XIV – 42 U.S.C. § 1983 CLAIM AGAINST TH CENTER FOR FAMILY AND CHILD ENRICHMENT, INC. FOR DAMAGES UNRELATED TO DEATH (SURVIVAL CLAIM)

292.    Plaintiff reavers and realleges paragraphs 1 through 157 as if fully set forth herein.

293.    This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation, under color of state law, of guaranteed rights under the Fourteenth Amendment of the United States Constitution which did not cause N.V.'s death.

294.    At all times material hereto, CFCE was a "person" and was acting under the color of state law within the meaning of 42 U.S.C. § 1983.

295.    At all times material hereto, pursuant to §§ 409.1671(1)(f)(1) and 409.993(1)(a), Florida Statutes, although foster care was a public function traditionally within the exclusive prerogative of the State of Florida, CFCE assumed responsibility as a private non-governmental entity.

296.    At all times material hereto, it was clearly established that children in the physical custody of the state foster care system, including N.V., had the constitutionally protected right to be safe and free from unreasonable risk of harm and to receive services in accordance with professional judgment.

297.    CFCE established and enforced a custom, policy, or practice of allowing foster children with known mental, behavioral, medical and emotional problems to be placed in emergency shelters, group homes, and traditional foster homes, notwithstanding that it was exposing such children to numerous dangers.

298.    CFCE established and enforced a custom, policy, or practice that failed to ensure that mental health, substance abuse, behavioral needs, and medical needs of foster children in state custody were assessed, evaluated, and treated in accordance with professional judgment.

299.    CFCE established and enforced a custom, policy, or practice on a widespread basis that failed to require recommendations from psychological evaluations, psychiatric evaluations, mental health evaluations, Level of Care Assessments, and Suitability Assessments, to be followed in accordance with professional judgment, thereby exposing children in its care to the substantial risk of serious harm.

300.    CFCE established and enforced a custom, policy, or practice of allowing foster children with known mental, behavioral, emotional, and substance abuse problems to be placed in

dangerous group homes, emergency shelter placements, and foster homes from where they could, and did, run away, notwithstanding that it was exposing such children to dangers and the substantial risk of serious harm on the streets including criminal acts, drug use, engaging in risky sexual behaviors, and becoming victims of human trafficking.

301.     CFCE established and enforced a custom, policy, or practice of failing to appropriately staff cases and assess children who returned from runaway to ensure appropriate services, placement, and a plan of care to prevent further runaway episodes and deterioration while in care.

302.     CFCE established and enforced a custom, policy, or practice of failing to ensure Court Orders from the Dependency Court were complied with regarding placement, services, supervision, and monitoring of children in foster care.

303.     CFCE was responsible for, but failed to ensure that children under its care, including N.V., had a complete and accurate plan of care that addressed their needs consistent with their mental health evaluations and their level of care and failed to continually assess and determine any need for service referrals in accordance with professional judgment.

304.     At all times material hereto, CFCE did not provide services or placements to N.V., who was in the physical and legal custody of CFCE, in accordance with professional judgment, and was deliberately indifferent and/or acted with reckless disregard to the N.V.'s health, safety, and welfare and Constitutional and federal rights, including, without limitation, utilizing dangerous emergency shelters for children in its care; utilizing dangerous group homes for children in its care; utilizing dangerous traditional foster homes for children in its care; failing to ensure that N.V. was placed in a safe environment that could meet her needs, failing to ensure a sufficient safety plan was implemented and followed to protect N.V. from sexual abuse while in care and sexually reactive and aggressive behaviors; failing to ensure that N.V. received individual

counseling as necessary, as recommended, and as Court ordered; failing to ensure that N.V. received behavior analyst services as necessary and recommended; failing to ensure N.V. was placed in a medical foster home when recommended; failing to ensure N.V. was placed in a specialized therapeutic foster home when recommended; failing to have appropriate and available placements for foster children in Miami-Dade County; failing to staff N.V.'s case and determine the need for enhanced services and change of placement each time N.V. returned from runaway; failing to ensure that N.V. received a Level of Care Assessment when she entered foster care in 2016; failing to ensure that N.V. received a Suitability Assessment as necessary and recommended; failing to ensure N.V. received updated mental health evaluations as necessary when her grades declined in school, she was suspended and expelled from school and she was arrested twice for increasingly violent acts; failing to ensure that N.V. received a substance abuse evaluation and treatment as necessary and recommended; failing to ensure N.V. was given proper assessments and services to prevent her from running away; failing to ensure Court Orders for supervision of N.V.'s cell phone, internet, and social media use were complied with; failing to ensure foster parents, shelter staff, and group home staff were told about Court Orders for supervision of N.V.'s cell phone, internet, and social media use so N.V. could be appropriately supervised and monitored; and by directly exposing N.V. to sexually reactive and aggressive behaviors, physical abuse, emotional abuse and neglect, causing her mental health condition to deteriorate and exposing N.V. to unnecessary risk of harm.

305. By April 18, 2016, when NV came back into care, CFCE had not addressed and taken corrective active actions to address deficiencies in the quality of its case management as identified in the Barahona reports in 2011, thereby exposing foster children, and N.V. in particular, to the substantial risk of serious harm.

306. CFCE violated N.V.'s Constitutional rights and exposed her to a substantial risk of serious harm by:

    a. Accepting responsibility for the care of N.V. knowing that N.V. was in immediate need of safe medical placement, but repeatedly authorizing placement in hotels, emergency shelters, group homes, and traditional foster homes, which were dangerous placements for N.V. that could not protect N.V. from harm.

    b. Accepting responsibility for the care of N.V. knowing that N.V. was in immediate need of safe therapeutic placement, but repeatedly authorizing placement in hotels, emergency shelters, group homes, and traditional foster homes, which were dangerous placements for N.V. that could not protect N.V. from harm.

    c. Accepting responsibility for the custody and care of N.V. knowing that N.V. was at high risk for danger, elopement and running away, had run away multiple times previously, and that she intended to run away from various placements, yet CFCE repeatedly placed N.V. in group homes, emergency shelters, and foster care placements which were dangerous placements for N.V. which could not protect N.V. from harm.

    d. Accepting responsibility for the care of N.V. knowing that N.V. was in immediate need of therapeutic, behavioral, mental health, psychiatric, psychological, emotional, substance abuse, and residential services but failing to ensure that she was assessed and referred for these immediate services.

    e. Accepting responsibility for the care of N.V. and exposing her to substantial risk of serious harm by failing to ensure a sufficient safety plan was

implemented and followed to prevent N.V.'s further sexually reactive and/or aggressive behaviors.

f. Allowing N.V.'s behaviors to escalate and mental health to significantly deteriorate when she was in foster care in 2014 and again in 2016-2017 when it exposed her to sexually reactive and aggressive behaviors, physical abuse, emotional abuse, and neglect in foster care placements and failed to provide her with appropriate therapeutic placements and services to address her emotional needs.

g. Deliberately ignored Court Orders, including one requiring supervision of N.V. while on the phone, internet, and social media and when concerns were brought to CFCE's attention about N.V.'s improper sexual conduct and excessive social media use, such concerns were minimized and dismissed, resulting in N.V. having ongoing access to these devices and methods of communication.

307. CFCE was deliberately indifferent to the serious psychiatric and psychological needs of children in its care and custody.

308. At all times that CFCE was taking the actions described herein, it was clearly established that children in the physical custody of the state foster care system, like N.V., have the Constitutionally and federally protected right to receive mental health services in accordance with professional judgment and not be exposed to deterioration of mental health and emotional harm.

309. Despite possessing the authority and means to remedy the unconstitutional treatment of the child and seek safe therapeutic placement and services to address N.V.'s serious mental health needs, CFCE was deliberately indifferent to N.V.'s right to receive treatment for her serious mental health needs by failing to timely address N.V.'s emotional, behavioral, and mental

health needs, and failing to ensure N.V. received safe, stable, therapeutic placement, which subjected N.V. to further psychological harm and deterioration.

310. Despite possessing the authority and means to remedy the unconstitutional treatment of N.V. and seek safe and secure therapeutic placement and services to address N.V.'s serious mental health needs, CFCE was deliberately indifferent to N.V.'s right to receive treatment for her serious mental health needs by failing to timely assess her medical, mental health, behavioral, psychological, substance abuse, and emotional needs, failing to timely address her medical, mental health, behavioral, psychological, substance abuse, and emotional needs, failing to ensure N.V. received safe, stable, medical, and therapeutic placement, and the substantial risk that N.V.'s condition would continue to deteriorate and CFCE knowingly and recklessly disregarded an excessive risk to her health and safety which subjected N.V. to further psychological harm and deterioration.

311. Despite possessing the authority and means to remedy the unconstitutional treatment of N.V., CFCE was deliberately indifferent to N.V.'s medical, mental health, behavioral, psychological, emotional, and substance abuse needs and the substantial risk that N.V.'s condition would continue to deteriorate and CFCE knowingly and recklessly disregarded an excessive risk to her health and safety.

312. At all times material hereto, CFCE knew of the dangers and risks of harm to foster children and children in state care, and to N.V. in particular, when on runaway status and/or away from their placement without authorization, including, but not necessarily limited to, physical and sexual assault, rape, pregnancy, sexually transmitted diseases, drug and alcohol use, homelessness, prostitution, abduction and kidnaping, domestic violence, human trafficking, murder, suicide, and death (said dangers having been extensively studied, reported upon, and are well known to child welfare professionals throughout the State of Florida and nationwide). Despite this knowledge, in

violation of multiple Florida Statutes, Florida Administrative Code rules, DCF Operating Procedures, OUR KIDS Operating Procedures, and CFCE Policies and Procedures, CFCE failed to ensure N.V. was placed in a safe placement or a secure facility, failed to ensure N.V. was placed in a safe placement or a secure facility when she returned from runaway, failed to prevent N.V. from eloping and running away, including failing to prevent N.V. from running away from CFCE's office, and failed to properly handle a runaway child or a child in danger and at risk of eloping. Rather, CFCE perceived and treated N.V. as a "throwaway child" and actually encouraged, assisted, and/or allowed N.V. to elope and run away, despite the known dangers and risk to N.V.

313.    CFCE took said actions described herein knowing it was exposing children who were in State custody, including N.V., to a substantial risk of serious harm.

314.    CFCE violated N.V.'s fundamental right of physical safety subjecting her to a heightened risk of danger.

315.    CFCE'S actions and failures to act were done with knowledge that said actions would deprive N.V. of her constitutional rights to be free from harm.

316.    Despite possessing the authority and means to remedy the unconstitutional treatment of N.V. and to seek and secure treatment and a safe, stable, and secure placement to address N.V.'s serious mental health needs, CFCE was deliberately indifferent to the substantial risk that N.V.'s condition would, and did, continue to deteriorate and knowingly and recklessly disregarded an excessive risk to her health and safety.

317.    As a direct and proximate result of CFCE'S deliberate indifference and/or recklessness, N.V. suffered emotional harm and deteriorating mental health and was further subjected to sexually reactive and aggressive behaviors, physical abuse, emotional abuse, and neglect, and suffered severe bodily harm and resulting pain and suffering, deterioration, discomfort, disability, mental anguish, loss of capacity for the enjoyment of life, and expenses of

hospitalization, medical and nursing care and treatment, exacerbation, aggravation and/or activation of preexisting conditions or disease, and other reasonably foreseeable compensatory damages.

318.   Plaintiff and N.V.'s Estate are obligated to the undersigned firms for payment of attorney's fees and costs, and seeks recovery of reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiff prays that this Honorable Court enter a judgment in favor of Plaintiff against Defendant, THE CENTER FOR FAMILY AND CHILD ENRICHMENT, INC., for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT XV – WRONGFUL DEATH CLAIM AGAINST
## THE CENTER FOR FAMILY AND CHILD ENRICHMENT, INC.

319.   Plaintiff, BERNARD PERLMUTTER, ESQ., as the duly appointed Personal Representative of the ESTATE of N.V. also brings this action against CFCE pursuant to §768.16, et. seq., Florida Statutes ("The Florida Wrongful Death Act"), on behalf of the deceased minor child's estate and the deceased minor child's beneficiaries: her natural mother (G.A. a/k/a G.C.), her natural father (Ni.V.), and/or four half siblings based upon any disclaimers, assignments, and/or as determined by Orders of the Probate Court.

320.   Plaintiff hereby reavers and realleges paragraphs 1 through 158 as if set forth fully herein.

321.   At all times material hereto, the deceased minor child was 14 years of age.

322.   This claim arises in negligence under Florida law, relating to actions taken by CFCE culminating in N.V. hanging herself in her foster home live on Facebook which resulted in her death on or about January 22, 2017, while under the care, custody, and supervision of CFCE.

323.    While N.V. was residing in foster care from April 2016 through January 2017, CFCE failed to assess N.V.'s serious emotional, behavioral, and mental health needs, failed to provide N.V. with a safe placement that could meet her serious emotional, behavioral and mental health needs and keep her safe, and failed to adequately supervise N.V., ultimately resulting in N.V.'s death on or about January 22, 2017.

324.    At all times material hereto, CFCE, as the sub-contracted agency contracted to provide child welfare services in Miami-Dade County, including case management services, therapeutic services, behavioral services, and targeted case management services, had the following statutory, contractual, and common law duties:

      a.  To keep N.V. safe while in its care, custody, and supervision;

      b.  To protect N.V. from further abuse, neglect, and victimization;

      c.  To provide a safe, secure environment where N.V. was free from unreasonable risk of harm;

      d.  To comply with Chapters 39 and 409 of the Florida Statutes, Florida Administrative Code, DCF Operating Procedures, OUR KIDS' Policies and Procedures, and CFCE Policies and Procedures regarding the health, welfare, and safety of N.V.;

      e.  To have available an appropriate continuum of services to address N.V.'s mental health and behavioral needs;

      f.  To have available an appropriate continuum of placements including medical foster homes and specialized therapeutic foster homes for children in its system of care, including N.V.;

      g.  To investigate the fitness of any proposed placement for N.V., taking into account her individualized physical, emotional, behavioral, and social needs, as well as her background and history;

      h.  To continually assess the adequacy and safety of N.V.'s particular placements;

      i.  To ensure that all available information is provided to foster parents regarding the foster children placed therein, including whether the child had a history of sexual abuse, sexual acting out, and/or sexual aggression, to enable caregivers to implement all precautionary measures to keep all foster children in that

placement safe, including N.V., pursuant to F.A.C. 65C-28.004, DCF Operating Procedures 175-88 and 170-11, and OKI OP No. 6000-10-013;

j.  To ensure safety plans, plans of care, and any other necessary safety measures were implemented and followed to prevent sexually reactive behaviors pursuant to F.A.C. 65C-28.004, DCF Operating Procedures 175-88 and 170-11, and OKI OP No. 6000-10-013;

k.  To ensure all necessary and appropriate assessments and evaluations for N.V. were completed in a timely manner, including, but not limited to, Level of Care Assessments, psychological evaluations, psychiatric evaluations, Suitability Assessments, and substance abuse evaluations;

l.  To ensure that all recommendations from assessors, evaluators, and other professionals regarding N.V., were followed and implemented in a timely manner;

m.  To ensure that N.V. consistently received appropriate services to meet her needs, including, but not limited to, individual counseling, education services, substance abuse services, behavioral services, targeted case management, and psychiatric treatment;

n.  To ensure all Court Orders regarding placement, services, supervision, and monitoring of N.V. were complied with;

o.  To ensure that N.V. was supervised at all times while using phones, internet, and social media;

p.  To outline a plan of care to handle any special management issues identified in the history and assessments to ensure that all foster children, including N.V. were safe, appropriately cared for, and adequately supervised; and

q.  To ensure that N.V. was assessed, referred for appropriate services, and placed in a safe placement when she returned from runaway status pursuant to F.A.C. 65C-30.019, DCF Operating Procedure 175-85, and OKI OP No. 7000-60-002.

325.  CFCE, through its agents and/or employees, breached said duties.

326.  As a direct and proximate result of the aforementioned breaches, N.V. hung herself in the bathroom of her bedroom in JANVIER'S foster home while live streaming on Facebook and was otherwise unsupervised and N.V. died while in the care and custody of CFCE; N.V.'s survivors have suffered and will continue to suffer mental pain and suffering and loss of companionship, comfort, society, services, and filial consortium; and N.V.'s estate has suffered

and will continue to suffer medical expenses. These losses are either permanent or continuing in nature.

WHEREFORE, Plaintiff demands judgment against Defendant, THE CENTER FOR FAMILY AND CHILD ENRICHMENT, INC., for compensatory damages, costs, all damages allowable under § 768.21, Florida Statutes, and all other such relief as the Court may deem just and proper.

**COUNT XVI – CULPABLE NEGLIGENCE CLAIM AGAINST
THE CENTER FOR FAMILY AND CHILD ENRICHMENT, INC.
FOR WRONGFUL DEATH**

327. Plaintiff, BERNARD PERLMUTTER, ESQ., as the duly appointed Personal Representative of the ESTATE of N.V. also brings this action against CFCE pursuant to §768.16, et. seq., Florida Statutes ("The Florida Wrongful Death Act"), on behalf of the deceased minor child's estate and the deceased minor child's beneficiaries: her natural mother (G.A. a/k/a G.C.), her natural father (Ni.V.), and/or four half siblings based upon any disclaimers, assignments, and/or as determined by Orders of the Probate Court.

328. Plaintiff hereby reavers and realleges paragraphs 1 through 158 as if set forth fully herein.

329. At all times material hereto, the deceased minor child was 14 years of age.

330. This claim arises in negligence under Florida law, relating to actions taken by CFCE culminating in N.V. hanging herself in her foster home live on Facebook which resulted in her death on or about January 22, 2017, while under the care, custody, and supervision of CFCE.

331. The cumulative actions on the part of Defendant CFCE demonstrate that CFCE acted with willful and wanton disregard of human rights, safety, and/or property in its provision of protective supervision to N.V. and/or acted with reckless indifference or grossly careless

disregard of human life in its provision of protective supervision to N.V. and such acts resulted in N.V.'s death based upon the following facts:

    a.  No later than March 2011, CFCE was on notice of deficiencies in the quality of its case management as identified by the Barahona Investigative Team following the death of Nubia Barahona and the egregious abuse of her brother. CFCE was required to address these deficiencies via corrective action, but CFCE failed to do so, and the same deficiencies still existed throughout this case including superficial observations of N.V.; lack of integration of information sharing and communication among the professionals involved in this case; unclear case ownership and case integration among OUR KIDS and CFCE; insufficient attention to health care, mental health care, and educational support; failure to act in the face of significant evidence that N.V. was receiving inadequate care in her various placements; conflicting professional opinions without any resolution; overall substandard quality of documentation by case managers; failure to implement recommendations from Level of Care Assessments and in this case failure to even obtain a Level of Care Assessment during N.V.'s last stay in foster care between April 2016 and January 2017 as was required; disregard in the need to document and monitor N.V.'s safety and wellbeing; and serious symptoms of depression and thoughts of suicide identified in evaluations which did not result in therapy as recommended and required by Court Order;

    b.  CFCE failed to ensure N.V. was immediately placed in a medical foster home when recommended by professional judgment due to her sickle cell anemia diagnosis;

c.  CFCE failed to ensure N.V. was immediately placed in a specialized therapeutic foster home when recommended by professional judgment;

d.  CFCE failed to ensure N.V. immediately and continuously received individual counseling, behavior analyst services, psychiatric treatment, and targeted case management when she was placed in foster care in 2016 and 2017, despite knowledge that these services had been recommended and were necessary to ensure her safety and prevent her from deteriorating;

e.  CFCE continuously failed to inform N.V.'s foster parents that there was a Court Order for N.V. to be supervised and monitored while on the phone, internet, and social media resulting in caregivers being uninformed and unable to provide N.V. with the level of care and supervision she required, and which was Court Ordered;

f.  CFCE deliberately ignored Court Orders, including one requiring supervision of N.V. while on the phone, internet, and social media and when concerns were brought to CFCE's attention about N.V.'s improper sexual conduct and excessive social media use, such concerns were minimized and dismissed, resulting in N.V. having ongoing access to these devices and methods of communication and being able to live stream her suicide on Facebook while unsupervised; and

g.  Between April 2016 and December 2016, CFCE authorized placement of N.V. in sixteen different placements, none of which were therapeutic, which resulted in N.V.'s significant and rapid mental health deterioration culminating in the final placement with JANVIER, a foster parent who had been licensed for only two days at the time N.V. was placed with her, had no experience dealing with

children with even slight mental health and behavior problems let alone the significant problems N.V. had, was unable to provide the level of supervision and monitoring N.V. required to keep her safe including monitoring N.V.'s phone, internet, and social media usage as Court ordered, and whose home N.V. died by suicide in while live on Facebook unsupervised.

332. As a direct and proximate cause of CFCE'S willful and wanton disregard of N.V. and culpably negligent acts, N.V. hung herself in the bathroom of her bedroom in JANVIER'S foster home while live streaming on Facebook and was otherwise unsupervised and N.V. died while in the care and custody of CFCE; N.V.'s survivors have suffered and will continue to suffer mental pain and suffering and loss of companionship, comfort, society, services, and filial consortium; and N.V.'s estate has suffered and will continue to suffer medical expenses. The losses are either permanent or continuing in nature.

333. The caps and limitations of §§ 409.1671 and 409.993, Florida Statutes, are inapplicable to these damages claims because of CFCE'S reckless, willful and/or dangerous acts proximately caused N.V.'s death.

WHEREFORE, Plaintiff demands judgment for damages in excess of the statutory caps found in §§ 409.1671 and 409.993, Florida Statutes, against Defendant, THE CENTER FOR FAMILY AND CHILD ENRICHMENT, INC.

### COUNT XVII – 42 U.S.C. § 1983 CLAIM AGAINST THE CENTER FOR FAMILY AND CHILD ENRICHMENT, INC. FOR WRONGFUL DEATH

334. Plaintiff reavers and realleges paragraphs 1 through 158 as if fully set forth herein.

335. This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation, under color of state law, of guaranteed rights under the Fourteenth Amendment of the United States Constitution which caused N.V.'s death.

336.    At all times material hereto, CFCE was a "person" and was acting under the color of state law within the meaning of 42 U.S.C. § 1983.

337.    At all times material hereto, pursuant to §§ 409.1671(1)(f)(1) and 409.993(1)(a), Florida Statutes, although foster care was a public function traditionally within the exclusive prerogative of the State of Florida, CFCE assumed responsibility as a private non-governmental entity.

338.    At all times material hereto, it was clearly established that children in the physical custody of the state foster care system, including N.V., had the constitutionally protected right to be safe and free from unreasonable risk of harm and to receive services in accordance with professional judgment.

339.    CFCE established and enforced a custom, policy, or practice of allowing foster children with known mental, behavioral, medical and emotional problems to be placed in traditional foster homes, notwithstanding that it was exposing such children to numerous dangers.

340.    CFCE established and enforced a custom, policy, or practice that failed to ensure that mental health, substance abuse, behavioral needs, and medical needs of foster children in state custody were assessed, evaluated, and treated in accordance with professional judgment.

341.    CFCE established and enforced a custom, policy, or practice on a widespread basis that failed to require recommendations from psychological evaluations, psychiatric evaluations, mental health evaluations, Level of Care Assessments, and Suitability Assessments, to be followed in accordance with professional judgment, thereby exposing children in its care to the substantial risk of serious harm.

342.    CFCE established and enforced a custom, policy, or practice of failing to appropriately staff cases and assess children who returned from runaway to ensure appropriate services, placement, and a plan of care to prevent further deterioration while in care.

343. CFCE established and enforced a custom, policy, or practice of failing to ensure Court Orders from the Dependency Court were complied with regarding placement, services, supervision, and monitoring of children in foster care.

344. CFCE was responsible for, but failed to ensure that children under its care, including N.V., had a complete and accurate plan of care that addressed their needs consistent with their mental health evaluations and their level of care and failed to continually assess and determine any need for service referrals in accordance with professional judgment.

345. At all times material hereto, CFCE did not provide services or placements to N.V., who was in the physical and legal custody of CFCE, in accordance with professional judgment, and was deliberately indifferent and/or acted with reckless disregard to the N.V.'s health, safety, and welfare and Constitutional and federal rights, including, without limitation, utilizing dangerous emergency shelters for children in its care; utilizing dangerous group homes for children in its care; utilizing dangerous traditional foster homes for children in its care; failing to ensure that N.V. was placed in a safe environment that could meet her needs, failing to ensure a sufficient safety plan was implemented and followed to protect N.V. from sexual abuse while in care and sexually reactive and aggressive behaviors; failing to ensure that N.V. received individual counseling as necessary, as recommended, and as Court ordered; failing to ensure that N.V. received behavior analyst services as necessary and recommended; failing to ensure N.V. was placed in a medical foster home when recommended; failing to ensure N.V. was placed in a specialized therapeutic foster home when recommended; failing to have appropriate and available placements for foster children in Miami-Dade County; failing to staff N.V.'s case and determine the need for enhanced services and change of placement each time N.V. returned from runaway; failing to ensure that N.V. received a Level of Care Assessment when she entered foster care in 2016; failing to ensure that N.V. received a Suitability Assessment as necessary and recommended;

failing to ensure N.V. received updated mental health evaluations as necessary when her grades declined in school, she was suspended and expelled from school and she was arrested twice for increasingly violent acts; failing to ensure that N.V. received a substance abuse evaluation and treatment as necessary and recommended; failing to ensure N.V. was given proper assessments and services to prevent her from running away; failing to ensure Court Orders for supervision of N.V.'s cell phone, internet, and social media use were complied with; failing to ensure foster parents, shelter staff, and group home staff were told about Court Orders for supervision of N.V.'s cell phone, internet, and social media use so N.V. could be appropriately supervised and monitored; and authorizing placement of N.V. in sixteen different placements, none of which were therapeutic, between April 2016 and December 2016 which resulted in N.V.'s significant and rapid mental health deterioration culminating in the final placement with JANVIER, a foster parent who had been licensed for only two days at the time N.V. was placed with her, had no experience dealing with children with even slight mental health and behavior problems let alone the significant problems N.V. had, was unable to provide the level of supervision and monitoring N.V. required to keep her safe including monitoring N.V.'s phone, internet, and social media usage as Court ordered, and whose home N.V. died by suicide in while live on Facebook unsupervised, thereby directly exposing N.V. to unnecessary risk of harm and death.

346. By April 18, 2016, when NV came back into care, CFCE had not addressed and taken corrective active actions to address deficiencies in the quality of its case management as identified in the Barahona reports in 2011, thereby exposed foster children, and N.V. in particular, to the substantial risk of serious harm.

347. CFCE violated N.V.'s Constitutional rights and exposed her to a substantial risk of serious harm by:

a.  Accepting responsibility for the care of N.V. knowing that N.V. was in immediate need of safe medical placement, but repeatedly authorizing placement in hotels, emergency shelters, group homes, and traditional foster homes, which were dangerous placements for N.V. that could not protect N.V. from harm.

b.  Accepting responsibility for the care of N.V. knowing that N.V. was in immediate need of safe therapeutic placement, but repeatedly authorizing placement in hotels, emergency shelters, group homes, and traditional foster homes, which were dangerous placements for N.V. that could not protect N.V. from harm.

c.  Accepting responsibility for the custody and care of N.V. knowing that N.V. was at high risk for danger, elopement and running away, had run away multiple times previously, and that she intended to run away from various placements, yet CFCE repeatedly authorized placement of N.V. in group homes, emergency shelters, and foster care placements which were dangerous placements for N.V. which could not protect N.V. from harm.

d.  Accepting responsibility for the care of N.V. knowing that N.V. was in immediate need of therapeutic, behavioral, mental health, psychiatric, psychological, emotional, substance abuse, and residential services but failing to ensure that she was assessed and referred for these immediate services.

e.  Accepting responsibility for the care of N.V. and exposing her to substantial risk of serious harm by failing to ensure a sufficient safety plan was implemented and followed to prevent further sexually reactive and/or aggressive behaviors.

f. Allowing N.V.'s behaviors to escalate and mental health to significantly deteriorate between April 2016 and January 2017 by failing to provide her with appropriate therapeutic placements and services to address her emotional needs.

g. Deliberately ignoring Court Orders, including one requiring supervision of N.V. while on the phone, internet, and social media and when concerns were brought to CFCE's attention about N.V.'s improper sexual conduct and excessive social media use, such concerns were minimized and dismissed, resulting in N.V. having ongoing access to these devices and methods of communication.

h. Authorizing placement of N.V. in sixteen different placements, none of which were therapeutic, between April 2016 and December 2016 which resulted in N.V.'s significant and rapid mental health deterioration culminating in the final placement with JANVIER, a foster parent who had been licensed for only two days at the time N.V. was placed with her, had no experience dealing with children with even slight mental health and behavior problems let alone the significant problems N.V. had, was unable to provide the level of supervision and monitoring N.V. required to keep her safe including monitoring N.V.'s phone, internet, and social media usage as Court ordered, and whose home N.V. died by suicide in while live on Facebook unsupervised.

348.    CFCE was deliberately indifferent to the serious psychiatric and psychological needs of children in its care and custody.

349.    At all times that CFCE was taking the actions described herein, it was clearly established that children in the physical custody of the state foster care system, like N.V., have the

Constitutionally and federally protected right to receive mental health services in accordance with professional judgment and not be exposed to deterioration of mental health and emotional harm.

350. Despite possessing the authority and means to remedy the unconstitutional treatment of the child and seek safe therapeutic placement and services to address N.V.'s serious mental health needs, CFCE was deliberately indifferent to N.V.'s right to receive treatment for her serious mental health needs by failing to timely address N.V.'s emotional, behavioral, and mental health needs, and failing to ensure N.V. received safe, stable, therapeutic placement, which subjected N.V. to further psychological harm, deterioration, and death.

351. Despite possessing the authority and means to remedy the unconstitutional treatment of N.V. and seek safe and secure therapeutic placement and services to address N.V.'s serious mental health needs, CFCE was deliberately indifferent to N.V.'s right to receive treatment for her serious mental health needs by failing to timely assess her medical, mental health, behavioral, psychological, substance abuse, and emotional needs, failing to timely address her medical, mental health, behavioral, psychological, substance abuse, and emotional needs, failing to ensure N.V. received safe, stable, medical, and therapeutic placement, and the substantial risk that N.V.'s condition would continue to deteriorate and CFCE knowingly and recklessly disregarded an excessive risk to her health and safety which subjected N.V. to further psychological harm and deterioration and death.

352. Despite possessing the authority and means to remedy the unconstitutional treatment of N.V., CFCE was deliberately indifferent to N.V.'s medical, mental health, behavioral, psychological, emotional, and substance abuse needs and the substantial risk that N.V.'s condition would continue to deteriorate and CFCE knowingly and recklessly disregarded an excessive risk to her health and safety.

353.   CFCE took said actions described herein knowing it was exposing children who were in State custody, including N.V., to a substantial risk of serious harm.

354.   CFCE violated N.V.'s fundamental right of physical safety subjecting her to a heightened risk of danger.

355.   CFCE'S actions and failures to act were done with knowledge that said actions would deprive N.V. of her constitutional rights to be free from harm.

356.   Despite possessing the authority and means to remedy the unconstitutional treatment of N.V. and to seek and secure treatment and a safe, stable, and secure placement to address N.V.'s serious mental health needs, CFCE was deliberately indifferent to the substantial risk that N.V.'s condition would and did continue to deteriorate and knowingly and recklessly disregarded an excessive risk to her health and safety.

357.   As a direct and proximate result of CFCE'S deliberate indifference and/or recklessness, N.V. suffered death; N.V.'s survivors have suffered and will continue to suffer mental pain and suffering and loss of companionship, comfort, society, services, and filial consortium; and N.V.'s estate has suffered and will continue to suffer medical expenses. These losses are either permanent or continuing in nature.

358.   Plaintiff and N.V.'s Estate are obligated to the undersigned firms for payment of attorney's fees and costs, and seeks recovery of reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, Plaintiff prays that this Honorable Court enter a judgment in favor of Plaintiff against Defendant, THE CENTER FOR FAMILY AND CHILD ENRICHMENT, INC., for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT XVIII – NEGLIGENCE CLAIM AGAINST
## MIAMI BRIDGE YOUTH AND FAMILY SERVICES, INC.
## FOR DAMAGES UNRELATED TO DEATH (SURVIVAL CLAIM)

359.   N.V., who died on or about January 22, 2017, after this cause of action arose in her favor, but prior to the filing of this Complaint, would have been the plaintiff in this action if she had lived and not died by suicide on that date.

360.   This claim arises in negligence pursuant to § 46.021, Florida Statutes, relating to actions taken by MIAMI BRIDGE which did not cause N.V.'s death.

361.   Plaintiff hereby reavers and realleges paragraphs 1-8, 11-12, 16, 77-119 as if fully set forth herein.

362.   At all times material hereto, MIAMI BRIDGE, as the agency providing emergency shelter services to foster children in Miami-Dade County, had the following statutory, contractual, and common law duties:

       a.   To keep N.V. safe while in its care, custody, and supervision;

       b.   To provide a safe, secure environment where N.V. was free from unreasonable risk of harm;

       c.   To use reasonable care in the oversight and supervision of N.V.;

       d.   To deny N.V. admission into the MIAMI BRIDGE Emergency Shelter based on her special needs and emotional problems that MIAMI BRIDGE could not accommodate;

       e.   To protect N.V. from further abuse, neglect, and victimization;

       f.   To have knowledge of N.V.'s individualized physical, emotional, behavioral, and social needs, as well as her background and history upon admission into MIAMI BRIDGE, and if such information wasn't immediately available, to follow-up with CFCE and OUR KIDS until such information was received;

       g.   To ensure N.V. received a comprehensive psychosocial assessment, mental health screening, suicide risk screening, assessment of suicide risk, and a substance abuse screening upon admission to MIAMI BRIDGE and ongoing as needed through her placement(s) there;

h. To provide N.V. with direct services to meet her mental health needs, including, but not limited to, intensive crisis counseling, case management, individual counseling, group counseling, family counseling, substance abuse treatment, runaway prevention services, and educational services timely upon identification of the need;

i. To refer N.V. for substance abuse and psychiatric services timely upon identification of the need;

j. To ensure that all available information is obtained regarding the foster children placed at MIAMI BRIDGE Emergency Shelter, including whether the child had a history of sexual abuse, sexual acting out, and/or sexual aggression, and to implement precautionary measures to keep all foster children in that facility safe, including N.V.;

k. To ensure safety plans, plans of care, and any other necessary safety measures were implemented to ensure all foster children with known sexual histories would not engage in sexual behaviors at MIAMI BRIDGE;

l. To ensure that all recommendations from assessors, evaluators, and other professionals regarding N.V., were followed and implemented in a timely manner;

m. To ensure that N.V. received appropriate services to meet her needs, including, but not limited to, individual counseling, substance abuse treatment, education services, behavioral services, targeted case management, and psychiatric treatment;

n. To continually assess the adequacy and safety of N.V.'s placement at MIAMI BRIDGE Emergency Shelter;

o. To comply with Chapters 39 and 409 of the Florida Statutes, Florida Administrative Code, DCF Operating Procedures, OUR KIDS Policies and Procedures, and MIAMI BRIDGE Policies and Procedures regarding emergency shelter services and child safety;

p. To ensure that safety plans or plans of care were signed, implemented and followed to ensure N.V. was safe and appropriately cared for, and if MIAMI BRIDGE could not comply with N.V.'s particular safety plan, to immediately deny N.V. admission to MIAMI BRIDGE;

q. To ensure that all children in MIAMI BRIDGE emergency shelter, including N.V., were safe, appropriately cared for, and adequately supervised;

r. To comply with Court orders requiring supervision and monitoring of residents on the phone, internet, and social media, including the one in place requiring supervision of N.V.;

s. To provide any necessary safety measures to ensure N.V. was adequately supervised; and

t. To ensure that N.V. was provided with appropriate education.

363. MIAMI BRIDGE, through its agents and/or employees, breached said duties.

364. As a direct and proximate result of the aforementioned breaches, N.V. suffered emotional harm and deteriorating mental health and was further subjected to sexual abuse, sexually reactive and/or aggressive behaviors, physical abuse, emotional abuse, and neglect, and suffered severe bodily harm and resulting pain and suffering, deterioration, discomfort, disability, mental anguish, loss of capacity for the enjoyment of life, and expenses of hospitalization, medical and nursing care and treatment, exacerbation, aggravation and/or activation of preexisting conditions or disease, and other reasonably foreseeable compensatory damages.

WHEREFORE, Plaintiff demands judgment against Defendant, MIAMI BRIDGE YOUTH AND FAMILY SERVICES, INC., for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

## COUNT XIX – CULPABLE NEGLIGENCE CLAIM AGAINST MIAMI BRIDGE YOUTH AND FAMILY SERIVCES, INC. FOR DAMAGES UNRELATED TO DEATH (SURVIVAL CLAIM)

365. N.V., who died on or about January 22, 2017, after this cause of action arose in her favor, but prior to the filing of this Complaint, would have been the plaintiff in this action if she had lived and not died by suicide on that date.

366. This claim arises in negligence pursuant to § 46.021, Florida Statutes, relating to actions taken by MIAMI BRIDGE which did not cause N.V.'s death.

367. Plaintiff hereby reavers and realleges paragraphs 1-8, 11-12, 16, 77-119 as if fully set forth herein.

368. The cumulative actions on the part of Defendant MIAMI BRIDGE demonstrate that MIAMI BRIDGE acted with willful and wanton disregard of human rights, safety, and/or property in its provision of protective supervision to N.V. and/or acted with reckless indifference or grossly careless disregard of human life in its provision of protective supervision to N.V. based upon the following facts:

      a. MIAMI BRIDGE knew that it admitted foster children with serious emotional and behavioral problems into MIAMI BRIDGE emergency shelter that the emergency shelter was not equipped to handle, including N.V.;

      b. MIAMI BRIDGE failed to deny N.V. admission into its emergency shelter despite knowledge that it could not meet her needs or protect her from harm;

      c. MIAMI BRIDGE failed to perform an appropriate admission assessment and intake on N.V. and failed to ensure N.V. was immediately removed from its emergency shelter when it could not meet her needs or protect her from harm;

      d. MIAMI BRIDGE accepted children with sexual abuse histories, sexually reactive behaviors, and sexually aggressive behaviors into its emergency shelters without implementing sufficient safety plans to prevent further incidents of sexualized behaviors;

      e. MIAMI BRIDGE refused to sign N.V.'s safety plan which was required to keep her from engaging in sexually reactive behaviors and to otherwise keep her safe;

      f. MIAMI BRIDGE placed N.V. in bedrooms with other residents despite knowledge that she required her own bedroom due to her sexualized history, aggressive history, and mental health history, resulting in N.V. getting into physical fights with roommates;

g. MIAMI BRIDGE deliberately failed to comply with N.V.'s safety plan and Court Orders which required that N.V. be supervised at all times while on the phone, internet, and social media;

h. MIAMI BRIDGE knew that its emergency shelter was a dangerous placement for N.V., that it could not meet her mental health needs or protect her from further harm, and failed to ensure she received the appropriate services and safe placement she needed;

i. MIAMI BRIDGE failed to ensure N.V., who was in its physical custody, received timely individual counseling, substance abuse services, behavioral services, and psychiatric treatment when she was placed at MIAMI BRIDGE Emergency Shelter despite knowledge that these services had been recommended, Court Ordered, and were necessary to meet her needs based upon professional judgment to prevent her deterioration; and

369. As a direct and proximate result of the aforementioned breaches, N.V. suffered emotional harm and deteriorating mental health and was further subjected to sexualized behaviors, physical abuse, emotional abuse, and neglect, and suffered severe bodily harm and resulting pain and suffering, deterioration, discomfort, disability, mental anguish, loss of capacity for the enjoyment of life, and expenses of hospitalization, medical and nursing care and treatment, exacerbation, aggravation and/or activation of preexisting conditions or disease, and other reasonably foreseeable compensatory damages.

370. The caps and limitations of §§ 409.1671 and 409.993, Florida Statutes, are inapplicable to N.V.'s damages because of MIAMI BRIDGE'S reckless, willful and/or dangerous acts.

WHEREFORE, Plaintiff demands judgment for damages in excess of the statutory caps found in §§ 409.1671 and 409.993, Florida Statutes, against Defendant, MIAMI BRIDGE YOUTH AND FAMILY SERVICES, INC.

**COUNT XX – NEGLIGENCE CLAIM AGAINST
HIS HOUSE, INC. D/B/A HIS HOUSE CHILDREN'S HOME
FOR DAMAGES UNRELATED TO DEATH (SURVIVAL CLAIM)**

371.    N.V., who died on or about January 22, 2017, after this cause of action arose in her favor, but prior to the filing of this Complaint, would have been the plaintiff in this action if she had lived and not died by suicide on that date.

372.    This claim arises in negligence pursuant to § 46.021, Florida Statutes, relating to actions taken by HIS HOUSE which did not cause N.V.'s death.

373.    Plaintiff hereby reavers and realleges paragraphs 1-8, 11, 13, 16, 136-145 as if fully set forth herein.

374.    At all times material hereto, HIS HOUSE, as the sub-contracted agency providing residential group care services to foster children in Miami-Dade County, had the following statutory, contractual, and common law duties:

        a.  To keep N.V. safe while in its care, custody, and supervision;

        b.  To provide a safe, secure environment where N.V. was free from unreasonable risk of harm;

        c.  To use reasonable care in the oversight and supervision of N.V.;

        d.  To deny N.V. admission into HIS HOUSE based on her special needs and emotional problems that HIS HOUSE could not accommodate;

        e.  To protect N.V. from further abuse, neglect, and victimization;

        f.  To have knowledge of N.V.'s individualized physical, emotional, behavioral, and social needs, as well as her background and history upon admission into HIS HOUSE, and if such information wasn't immediately available, to follow-up with CFCE and OUR KIDS until such information was received;

g. To ensure N.V. received a comprehensive psychosocial assessment, mental health screening, suicide risk screening, assessment of suicide risk, and a substance abuse screening upon admission to HIS HOUSE and ongoing as needed through her placement(s) there;

h. To provide N.V. with direct services to meet her mental health needs, including, but not limited to, intensive crisis counseling, case management, individual counseling, group counseling, family counseling, substance abuse treatment, runaway prevention services, and educational services timely upon identification of the need;

i. To refer N.V. for substance abuse and psychiatric services timely upon identification of the need;

j. To ensure that all available information is obtained regarding the foster children placed at HIS HOUSE, including whether the child had a history of sexual abuse, sexual acting out, and/or sexual aggression, and to implement precautionary measures to keep all foster children in that facility safe, including N.V.;

k. To ensure safety plans, plans of care, and any other necessary safety measures were implemented to ensure all foster children with known sexual histories would not engage in sexual behaviors at HIS HOUSE;

l. To ensure that all recommendations from assessors, evaluators, and other professionals regarding N.V., were followed and implemented in a timely manner;

m. To ensure that N.V. received appropriate services to meet her needs, including, but not limited to, individual counseling, substance abuse treatment, education services, behavioral services, targeted case management, and psychiatric treatment;

n. To continually assess the adequacy and safety of N.V.'s placement at HIS HOUSE;

o. To comply with Chapters 39 and 409 of the Florida Statutes, Florida Administrative Code, DCF Operating Procedures, OUR KIDS Policies and Procedures, and HIS HOUSE Policies and Procedures regarding residential group care services and child safety;

p. To ensure that safety plans or plans of care were implemented and followed to ensure N.V. was safe and appropriately cared for, and if HIS HOUSE could not comply with N.V.'s particular safety plan, to immediately deny N.V. admission to HIS HOUSE;

q.  To ensure that all children in HIS HOUSE, including N.V., were safe, appropriately cared for, and adequately supervised;

r.  To comply with Court orders requiring supervision and monitoring of residents on the phone, internet, and social media, including the one in place requiring supervision of N.V.;

s.  To provide any necessary safety measures to ensure N.V. was adequately supervised; and

t.  To ensure that N.V. was provided with appropriate education.

375.   HIS HOUSE, through its agents and/or employees, breached said duties.

376.   As a direct and proximate result of the aforementioned breaches, N.V. suffered emotional harm and deteriorating mental health and was further subjected to sexual abuse, sexually reactive and/or aggressive behaviors, physical abuse, emotional abuse, and neglect, and suffered severe bodily harm and resulting pain and suffering, deterioration, discomfort, disability, mental anguish, loss of capacity for the enjoyment of life, and expenses of hospitalization, medical and nursing care and treatment, exacerbation, aggravation and/or activation of preexisting conditions or disease, and other reasonably foreseeable compensatory damages.

WHEREFORE, Plaintiff demands judgment against Defendant, HIS HOUSE, INC., D/B/A HIS HOUSE CHILDREN'S HOME, for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

**COUNT XXI – CULPABLE NEGLIGENCE CLAIM AGAINST**
**HIS HOUSE, INC., D/B/A HIS HOUSE CHILDREN'S HOME**
**FOR DAMAGES UNRELATED TO DEATH (SURVIVAL CLAIM)**

377.   N.V., who died on or about January 22, 2017, after this cause of action arose in her favor, but prior to the filing of this Complaint, would have been the plaintiff in this action if she had lived and not died by suicide on that date.

378.   This claim arises in negligence pursuant to § 46.021, Florida Statutes, relating to actions taken by HIS HOUSE which did not cause N.V.'s death.

117

379.    Plaintiff hereby reavers and realleges paragraphs 1-8, 11, 13, 16, 136-145 as if fully set forth herein.

380.    The cumulative actions on the part of Defendant HIS HOUSE demonstrate that HIS HOUSE acted with willful and wanton disregard of human rights, safety, and/or property in its provision of protective supervision to N.V. and/or acted with reckless indifference or grossly careless disregard of human life in its provision of protective supervision to N.V. based upon the following facts:

   a.    HIS HOUSE knew that it admitted foster children with serious emotional and behavioral problems into its group home that the group home was not equipped to handle, including N.V.;

   b.    HIS HOUSE failed to deny N.V. admission into its group home despite knowledge that it could not meet her needs or protect her from harm;

   c.    HIS HOUSE failed to perform an appropriate admission assessment and intake on N.V. and failed to ensure N.V. was immediately removed from its emergency shelter when it could not meet her needs or protect her from harm;

   d.    HIS HOUSE accepted children with sexual abuse histories, sexually reactive behaviors, and sexually aggressive behaviors into its group home without implementing sufficient safety plans to prevent further incidents of sexualized behaviors;

   e.    HIS HOUSE placed N.V. in bedrooms with other residents despite knowledge that she required her own bedroom due to her sexualized history, aggressive history, and mental health history, resulting in N.V. getting into physical fights with roommates;

 f.  HIS HOUSE knew that its group home was a dangerous placement for N.V., that it could not meet her mental health needs or protect her from further harm, and failed to ensure she received the appropriate services and safe placement she needed;

 g.  HIS HOUSE deliberately failed to comply with N.V.'s safety plan and Court Orders which required that N.V. be supervised at all times while on the phone, internet, and social media;

 h.  HIS HOUSE failed to ensure N.V., who was in its physical custody, received timely individual counseling, substance abuse services, behavioral services, and psychiatric treatment when she was placed at HIS HOUSE despite knowledge that these services had been recommended, Court Ordered, and were necessary to meet her needs based upon professional judgment to prevent her deterioration; and

 i.  HIS HOUSE failed to take any action to protect N.V. when her behaviors had escalated and her mental health deteriorated to the point where she was threatened with a gun at school, suspended for ten days for fighting other students two days in a row, and got into repeated physical altercations with roommates and other peers culminating in N.V. getting arrested for the serious charge of aggravated battery for throwing boiling water on another resident at HIS HOUSE.

  381.  As a direct and proximate result of the aforementioned breaches, N.V. suffered emotional harm and deteriorating mental health and was further subjected to sexualized behaviors, physical abuse, emotional abuse, and neglect, and suffered severe bodily harm and resulting pain and suffering, deterioration, discomfort, disability, mental anguish, loss of capacity for the

enjoyment of life, and expenses of hospitalization, medical and nursing care and treatment, exacerbation, aggravation and/or activation of preexisting conditions or disease, and other reasonably foreseeable compensatory damages.

382. The caps and limitations of §§ 409.1671 and 409.993, Florida Statutes, are inapplicable to N.V.'s damages because of HIS HOUSE'S reckless, willful and/or dangerous acts.

WHEREFORE, Plaintiff demands judgment for damages in excess of the statutory caps found in §§ 409.1671 and 409.993, Florida Statutes, against Defendant, HIS HOUSE, INC., D/B/A HIS HOUSE CHILDREN'S HOME.

## COUNT XXII – NEGLIGENCE CLAIM AGAINST VANITA MOSQUERA FOR DAMAGES UNRELATED TO DEATH (SURVIVAL CLAIM)

383. N.V., who died on or about January 22, 2017, after this cause of action arose in her favor, but prior to the filing of this Complaint, would have been the plaintiff in this action if she had lived and not died by suicide on that date.

384. This claim arises in negligence pursuant to § 46.021, Florida Statutes, relating to actions taken by MOSQUERA which did not cause N.V.'s death.

385. Plaintiff hereby reavers and realleges paragraphs 1-10, 14, 17-48 as if fully set forth herein.

386. All conditions precedent pursuant to § 768.28, Florida Statutes, have been performed.

387. At all times material hereto, MOSQUERA, as N.V.'s foster parent, had the following duties:

    a. To keep N.V. safe while in her care, custody, and supervision;

    b. To protect N.V. from further abuse, neglect, and victimization and immediately prevent further harm;

c.  To provide a safe, secure environment where N.V. was free from unreasonable risk of harm;

d.  To have knowledge of N.V.'s individualized physical, emotional, behavioral, and social needs, as well as her background and history upon accepting N.V. into her foster home, and if such information wasn't immediately available, to follow-up with CHARLEE and OUR KIDS until such information was received;

e.  To immediately deny N.V. placement when her behaviors and level of supervision were more than MOSQUERA could manage and N.V. could not be kept safe in the home;

f.  To immediately request removal of N.V. when her behaviors and level of supervision required were more than MOSQUERA could manage and N.V. could not be kept safe in the home;

g.  To ensure that N.V. timely and consistently received a psychosexual evaluation and sexual abuse treatment when identified as a victim of sexual abuse and/or a sexually reactive or aggressive child pursuant to F.A.C. 65C-28.004 and DCF Operating Procedures 175-88 and 170-11;

h.  To ensure safety plans, plans of care, and any other necessary safety measures were implemented and followed to ensure N.V. was not further sexually abused and to prevent sexually reactive and aggressive behaviors pursuant to F.A.C. 65C-28.004 and DCF Operating Procedures 175-88 and 170-11;

i.  To ensure that all recommendations from assessors, evaluators, and other professionals regarding N.V., were followed and implemented in a timely manner;

j.  To ensure that N.V. consistently received appropriate services to meet her needs, including, but not limited to, sexual abuse therapy;

k.  To ensure all Court Orders regarding placement, services, supervision, and monitoring of N.V. were complied with;

l.  To ensure that N.V. was supervised at all times around other children;

m.  To outline a plan of care to handle any special management issues identified in the history and assessments to ensure that all children residing in the home, including N.V., were safe, appropriately cared for, and adequately supervised;

n.  To properly report incidents of sexual assault/sexual battery of N.V. by other children residing in the foster home; and

o. To prevent the sexual assault/sexual battery of N.V. while she was a six and seven-year-old foster child who was vulnerable to sexual abuse/assault/battery.

388. MOSQUERA breached said duties.

389. As a direct and proximate result of the aforementioned breaches, N.V. suffered emotional harm and deteriorating mental health and was further subjected to sexual abuse, physical abuse, emotional abuse, and neglect, and suffered severe bodily harm and resulting pain and suffering, deterioration, discomfort, disability, mental anguish, loss of capacity for the enjoyment of life, and expenses of hospitalization, medical and nursing care and treatment, exacerbation, aggravation and/or activation of preexisting conditions or disease, and other reasonably foreseeable compensatory damages.

WHEREFORE, Plaintiff demands judgment against Defendant, VANITA MOSQUERA, for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

## COUNT XXIII – NEGLIGENCE CLAIM AGAINST MAJORIE JANVIER FOR DAMAGES UNRELATED TO DEATH (SURVIVAL CLAIM)

390. N.V., who died on or about January 22, 2017, after this cause of action arose in her favor, but prior to the filing of this Complaint, would have been the plaintiff in this action if she had lived and not died by suicide on that date.

391. This claim arises in negligence pursuant to § 46.021, Florida Statutes, relating to actions taken by DCF which did not cause N.V.'s death.

392. Plaintiff hereby reavers and realleges paragraphs 1-8, 11, 15, 146-157 as if fully set forth herein.

393. All conditions precedent pursuant to § 768.28, Florida Statutes, have been performed.

394. At all times material hereto, JANVIER, as N.V.'s foster parent, had the following duties:

a.  To keep N.V. safe while in her care, custody, and supervision;

b.  To protect N.V. from further abuse, neglect, and victimization and immediately prevent further harm;

c.  To provide a safe, secure environment where N.V. was free from unreasonable risk of harm;

d.  To have knowledge of N.V.'s individualized physical, emotional, behavioral, and social needs, as well as her background and history upon accepting N.V. into her foster home, and if such information wasn't immediately available, to follow-up with CFCE and OUR KIDS until such information was received;

e.  To immediately deny N.V. placement when she could not have her own bedroom in the home and N.V. required her own bedroom to ensure her safety;

f.  To immediately deny N.V. placement when her behaviors and level of supervision required were more than JANVIER could manage and N.V. could not be kept safe in the home;

g.  To immediately request removal of N.V. when her behaviors and level of supervision required were more than JANVIER could manage and N.V. could not be kept safe in the home;

h.  To ensure that N.V. received sexual abuse treatment when identified as a victim of sexual abuse and/or a sexually reactive or aggressive child pursuant to F.A.C. 65C-28.004, DCF Operating Procedures 175-88 and 170-11, and OKI OP No. 6000-10-013;

i.  To ensure safety plans, plans of care, and any other necessary safety measures were implemented and followed to prevent sexually reactive and aggressive behaviors pursuant to F.A.C. 65C-28.004 and DCF Operating Procedures 175-88 and 170-11;

j.  To ensure that all recommendations from assessors, evaluators, and other professionals regarding N.V., were followed and implemented in a timely manner;

k.  To ensure that N.V. consistently received appropriate services to meet her needs, including, but not limited to, individual counseling, education services, substance abuse services, behavioral services, targeted case management, and psychiatric treatment;

l.  To ensure all Court Orders regarding placement, services, supervision, and monitoring of N.V. were complied with;

m.  To ensure that N.V. was supervised at all times while using phones, internet, and social media; and

n.  To outline a plan of care to handle any special management issues identified in the history and assessments to ensure that all children residing in the home, including N.V., were safe, appropriately cared for, and adequately supervised.

395.  JANVIER breached said duties.

396.  As a direct and proximate result of the aforementioned breaches, N.V. suffered emotional harm and deteriorating mental health and was further subjected to sexualized behaviors, physical abuse, emotional abuse, and neglect, and suffered severe bodily harm and resulting pain and suffering, deterioration, discomfort, disability, mental anguish, loss of capacity for the enjoyment of life, and expenses of hospitalization, medical and nursing care and treatment, exacerbation, aggravation and/or activation of preexisting conditions or disease, defect or condition, and other reasonably foreseeable compensatory damages.

WHEREFORE, Plaintiff demands judgment against Defendant, MAJORIE JANVIER, for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

## COUNT XXIV– WRONGFUL DEATH CLAIM AGAINST MAJORIE JANVIER

397.  Plaintiff, BERNARD PERLMUTTER, ESQ., as the duly appointed Personal Representative of the ESTATE of N.V. also brings this action against JANVIER pursuant to §768.16, et. seq., Florida Statutes ("The Florida Wrongful Death Act"), on behalf of the deceased minor child's estate and the deceased minor child's beneficiaries: her natural mother (G.A. a/k/a G.C.), her natural father (Ni.V.), and/or four half siblings based upon any disclaimers, assignments, and/or as determined by Orders of the Probate Court.

398.  Plaintiff hereby reavers and realleges paragraphs 1-8, 11, 15, 146-158 as if set forth fully herein.

399.  All conditions precedent pursuant to § 768.28, Florida Statutes, have been

124

performed.

400. At all times material hereto, the deceased minor child was 14 years of age.

401. This claim arises in negligence under Florida law, relating to actions taken by JANVIER culminating in N.V. hanging herself in her foster home live on Facebook which resulted in her death on or about January 22, 2017, while under the care, custody, and supervision of JANVIER.

402. While N.V. was residing in JANVIER'S foster home between December 21, 2016 and January 21, 2017, JANVIER failed to ensure N.V.'s serious emotional, behavioral, and mental health needs were assessed; failed to ensure N.V. was provided with a safe stable placement that could meet her serious emotional, behavioral and mental health needs and keep her safe; and failed to ensure N.V. was adequately supervised, ultimately resulting in N.V.'s death on or about January 22, 2017.

403. At all times material hereto, JANVIER, as N.V.'s foster parent, had the following duties:

      a. To keep N.V. safe while in her care, custody, and supervision;

      b. To protect N.V. from further abuse, neglect, and victimization and immediately prevent further harm;

      c. To provide a safe, secure environment where N.V. was free from unreasonable risk of harm;

      d. To have knowledge of N.V.'s individualized physical, emotional, behavioral, and social needs, as well as her background and history upon accepting N.V. into her foster home, and if such information wasn't immediately available, to follow-up with CFCE and OUR KIDS until such information was received;

      e. To immediately deny N.V. placement when she could not have her own bedroom in the home and N.V. required her own bedroom to ensure her safety;

      f. To immediately deny N.V. placement when her behaviors and level of supervision required were more than JANVIER could manage and N.V. could not be kept safe in the home;

g.  To immediately request removal of N.V. when her behaviors and level of supervision required were more than JANVIER could manage and N.V. could not be kept safe in the home;

h.  To ensure safety plans, plans of care, and any other necessary safety measures were implemented and followed to prevent sexually reactive and aggressive behaviors pursuant to F.A.C. 65C-28.004 and DCF Operating Procedures 175-88 and 170-11;

i.  To ensure that all recommendations from assessors, evaluators, and other professionals regarding N.V., were followed and implemented in a timely manner;

j.  To ensure that N.V. consistently received appropriate services to meet her needs, including, but not limited to, individual counseling, education services, substance abuse services, behavioral services, targeted case management, and psychiatric treatment;

k.  To ensure all Court Orders regarding placement, services, supervision, and monitoring of N.V. were complied with;

l.  To ensure that N.V. was supervised at all times while using phones, internet, and social media; and

m.  To outline a plan of care to handle any special management issues identified in the history and assessments to ensure that all children residing in the home, including N.V., were safe, appropriately cared for, and adequately supervised.

404.  JANVIER breached said duties.

405.  As a direct and proximate result of the aforementioned breaches, N.V. hung herself in the bathroom of her bedroom in JANVIER'S foster home while live streaming on Facebook and was otherwise unsupervised and N.V. died while in the care and custody of JANVIER; N.V.'s survivors have suffered and will continue to suffer mental pain and suffering and loss of companionship, comfort, society, services, and filial consortium; and N.V.'s estate has suffered and will continue to suffer medical expenses. These losses are either permanent or continuing in nature.

WHEREFORE, Plaintiff demands judgment against Defendant, MAJORIE JANVIER, for compensatory damages, costs, all damages allowable under § 768.21, Florida Statutes, and all other such relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all issues so triable in this case.

DATED this 22nd day of January, 2019.

Respectfully submitted,

**HALICZER, PETTIS & SCHWAMM, P.A.**
Co-Counsel for Plaintiff
225 East Robinson Street
Landmark Center Two – Suite 475
Orlando, FL 32801
Telephone: (407) 841-9866
Facsimile: (407) 841-9915
Richard B. Schwamm
Florida Bar No.: 897035
Eservice@hpslegal.com
Mmcnerney@hpslegal.com
Dbonilla@hpslegal.com

**TALENFELD LAW**
Co-Counsel for Plaintiff
1776 North Pine Island Road
Suite 222
Fort Lauderdale, Florida 33322
Telephone: (754) 888-KIDS
Facsimile: (954) 644-4848

*s/ Stacie J. Schmerling*
Howard M. Talenfeld
Florida Bar No. 312398
Stacie J. Schmerling
Florida Bar No. 0083862
howard@justiceforkids.us
stacie@justiceforkids.us
erica@justiceforkids.us